WAYNE KOHLMEIER *et al.*, Plaintiffs-Appellees, v. SHELTER INSURANCE COMPANY, Defendant-Appellant (Carl R. Carver *et al.*, Defendants).

Fifth District   No. 5—86—0083

Opinion filed May 16, 1988.—Rehearing denied June 10, 1988.

644

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (William F. Kopis, Stephen R. Swofford, and Lynn D. Dowd, of counsel), for appellant.

Edward J. Kionka, of Murphysboro, and Jerald J. Bonifield, of Belleville, for appellees.

JUSTICE LEWIS delivered the opinion of the court:

This was an action for breach of contract brought by plaintiff, Wayne Kohlmeier, on his own behalf and on behalf of his daughter, Amy Kohlmeier, for refusal of the defendant, Shelter Insurance Company, to pay for medical bills under a health insurance policy. The case was tried before a jury and resulted in judgments for the plaintiff in the amounts of $25,000 in compensatory damages for Wayne Kohlmeier, of $25,000 in compensatory damages for Amy Kohlmeier, and of $100,000 in punitive damages for Wayne Kohlmeier. Separate counts for attorney fees were considered by the circuit court and resulted in an award of $5,000 in attorney fees for plaintiff. From these judgments defendant appeals.

Plaintiffs' complaint set forth 12 counts, seven of which were dismissed after the presentation of evidence and before consideration by the jury. The three counts submitted to the jury were as follows: count I sought compensatory damages for breach of contract on behalf of plaintiff, count II sought compensatory damages for breach of contract on behalf of plaintiff's daughter, Amy Kohlmeier, and count VII sought punitive damages for defendant's breach of duty to deal fairly and in good faith with plaintiff and for the intentional infliction of emotional distress upon plaintiff caused by defendant's willful and wanton conduct. The remaining two counts, counts III and IV, related to attorney fees and were reserved for determination by the circuit court until after the conclusion of the jury trial.

In defendant's answer to plaintiffs' complaint, it asserted the affirmative defense that plaintiff had made a material misrepresentation on his insurance application form regarding his daughter's preexisting

medical condition. Because of plaintiff's material misrepresentation, defendant rescinded plaintiff's insurance policy and refunded his premium. Defendant claimed that the rescission rendered the policy void *ab initio* and refused to pay plaintiff's claims.

On appeal, defendant contends that because defendant's rescission of plaintiff's insurance policy was proper, there was no breach of contract, that the award of compensatory damages and punitive damages was excessive and improper, and that the circuit court abused its discretion when it imposed attorney fees under section 155 of the Illinois Insurance Code (Ill. Rev. Stat. 1983, ch. 73, par. 767). Defendant alternatively argues that a new trial should be granted as the verdicts were against the manifest weight of the evidence.

In order to address defendant's issues, a review of the facts is necessary. On May 14, 1982, plaintiff applied to an agent of defendant, Kenneth Schanz, for a health insurance policy. The agent, by asking questions of plaintiff and plaintiff's wife, prepared an application form which plaintiff then signed. The application form contained the following question: "Does any person to be insured now have any abnormality or deformity?" To this question plaintiff responded "no" for himself, for his wife and for his three children. It was because of plaintiff's answer to this question that defendant determined that plaintiff materially misrepresented his daughter Amy's medical condition.

As a result of plaintiff's application, defendant issued a health insurance policy to plaintiff effective July 14, 1982. The application was made a part of plaintiff's policy. The policy covered plaintiff, plaintiff's wife, and plaintiff's three children, Amy (age 10), Sarah (age eight), and Andrew (age five months) and included no waivers or exclusions with regard to any member of plaintiff's family. A two-year contestable period applied to the policy.

On January 15, 1983, plaintiff's daughter Amy was examined by a pediatric neurologist, Dr. Garrett Burris, at the recommendation of Thomas Palmer, a school psychologist. Palmer had discussed with plaintiff Amy's teachers' concerns that Amy may be having petit mal seizures. Reportedly, Amy had staring spells at school and she appeared to have an absence of consciousness during these spells.

At his examination, Dr. Burris conducted a quick screening of Amy's receptive language even though she had been evaluated by Thomas Palmer in December 1982. He found her receptive language skills (her understanding) and her handwriting quite primitive for a child of her age (10 years). During his examination Amy offered little in spontaneous communications and only answered questions in one-

or two-word phrases. Dr. Burris was aware, through discussions with plaintiff and plaintiff's wife, that Amy was socially immature and that she had had some slowness in her language development as a child. Plaintiff had also advised Dr. Burris that Amy had been having difficulty with her academic skills even with the help of a tutor.

In Dr. Burris' report, he described Amy's physical appearance as follows: that she had bushy, arching eyebrows, long eyelashes, ptosis (drooping eyelids), and epicanthal folds and hypertelorism (wide nasal bridge and a beak-like nose); that there was a downward slanting of the fissure of her eyes; that she had broad thumbs and toes; and that her head was small in circumference for her age. Dr. Burris determined that Amy was short in stature and below the third percentile in her weight, *i.e.*, that out of 100 children of her age, 97 of the children weighed more than Amy. According to Dr. Burris, Amy's physical features were abnormal but a person untrained in medicine would be unable to put these physical findings together as a collection of symptoms representative of a given disease process. In his office notes Dr. Burris remarked, "It was also remarkable to note her achievement scores relative to what was felt to be a low intellectual capacity."

On the basis of his examination, Dr. Burris diagnosed Amy as having Rubenstein-Taybi syndrome, an uncommon condition. His report revealed that this syndrome was congenital and was characterized by a specific group of abnormal physical features consisting of specific facial features, specific eye appearance, broad toes and thumbs, small stature, and small head size. It also affects mental condition in a variable degree from person to person. He found Amy to have the classical physical appearance of a person having this syndrome. With regard to Amy's mental condition, he concluded her capabilities were in the middle range of what her intellectual functioning would be expected to be. He also found Amy to be suffering from strabismus (crossed eyes) and that she had a long-standing history of this condition. He noted that Amy had a high palatal arch, also a feature of this syndrome. Dr. Burris recommended that Amy be admitted to a hospital for a complete evaluation.

Amy was admitted to Cardinal Glennon Memorial Hospital for Children on February 14, 1983, for further testing and evaluation. The evaluations and tests administered at the hospital corresponded with Dr. Garrett Burris' initial findings.

Plaintiff submitted the bills for Amy's evaluations and tests to defendant for payment. The total amount of Amy's bills was $3,116.50. Plaintiff also submitted claims for chiropractic treatments which he had received after the effective date of the insurance policy.

After plaintiff's claims were submitted to defendant for payment, Sheryl (Sherry) Miller, a claims specialist for the defendant, received plaintiff's file to investigate his claims. The investigation was conducted to determine if plaintiff had duplicate coverage on the claims submitted with Old Republic, another insurance company which also insured plaintiff. A report from Equifax, an investigatory company for insurance companies, had revealed that plaintiff also had an insurance policy with this insurer. Her investigation revealed that the other coverage provided by Old Republic was not the same coverage as provided by defendant.

Prompted by her conversation with Old Republic, Sherry called plaintiff's health service suppliers to verify plaintiff's claims for chiropractic treatment. One claim was a bill and receipt from Dr. Meinders, a chiropractor. The bill, signed by Dr. Meinders, indicated that a fee of $19 was charged and paid in cash. From Dr. Meinders Sherry learned that he did not charge plaintiff but that he had administered the chiropractic treatment to plaintiff, also a chiropractor, as a professional courtesy. According to Dr. Meinders, plaintiff had received the billing statement for income tax purposes and that he did not expect to receive payment.

Subsequently, because plaintiff's claims had not been paid, plaintiff contacted Sherry. Sherry explained to plaintiff that there was a delay as she was having difficulty in obtaining a medical history on his daughter Amy. Plaintiff advised her that Amy did not have a regular doctor.

Sherry had received Dr. Garrett Burris' office notes of his examination of Amy dated January 15, 1983, which reflected that Amy possibly had Rubenstein-Taybi syndrome, a rare congenital condition. The information contained in Dr. Burris' office notes prompted Sherry to write a memorandum enumerating the results of her investigation.

Carl Carver, supervisor of the special claims unit for defendant, received Sherry Miller's memorandum, which he submitted, along with plaintiff's file, to the underwriting department. The underwriting department reviewed the memorandum and plaintiff's file to determine if the material misrepresentation of Amy's previous health history was of importance. Because Rubenstein-Taybi syndrome was described as congenital and because definitive symptoms of this syndrome would be present since birth, the underwriting department concluded that Amy's condition was a preexisting condition prior to plaintiff's application for his insurance policy. The underwriting department recommended that given the information now provided, *i.e.*, the diagnosis of Rubenstein-Taybi syndrome, it would have declined to

insure Amy. Since plaintiff did not reveal any information about Amy's symptoms on the application form, it was determined that this failure to disclose Amy's symptoms was a material misrepresentation by plaintiff which warranted rescission of plaintiff's insurance policy. Carl Carver then presented the underwriter's recommendation, the memorandum, and plaintiff's file to the claims committee. The claims committee elected to rescind plaintiff's policy and to refund plaintiff's premium. Carver sent plaintiff a letter dated May 12, 1983, advising plaintiff of the rescission and refunding plaintiff his entire premium of $2,046.68.

Plaintiff asserted that he was unaware that his daughter had this rare congenital syndrome or that she had any abnormality prior to Dr. Burris' diagnosis. Prior to completing the insurance application, plaintiff knew that Amy had had to wear glasses for the past four or five years in order to correct her strabismus (crossed eyes). He had been informed by a Dr. Szewczyk that Amy's strabismus was caused by a slight muscle imbalance in her eyes. Amy's glasses appeared to correct the problem.

When Amy was approximately two years old, plaintiff had taken Amy to Dr. Rashet, a pediatrician. Dr. Rashet had told plaintiff that Amy was perfectly normal.

When Amy was three years old, plaintiff had taken Amy to St. Louis University Department of Communications for a speech and language evaluation, because Amy's speech was unintelligible. Amy had a high palatal arch and plaintiff was concerned that this condition impeded her speech. The test results of the evaluation conducted at St. Louis University had indicated that Amy was delayed in expressive language but that she appeared to be highly stimulable.

In May 1977, prior to entering kindergarten, Amy was evaluated by Merle Wischmeier, a school psychologist. Amy's test results had disclosed that she had deficiencies in her gross and fine motor skills, in listening, and in her attention span. Although Amy's intelligence tests had revealed that Amy was perhaps borderline mentally retarded, she was not labelled mentally deficient because of her age. Wischmeier recommended that Amy be placed in the "Early Childhood Program" (a special education program designed to develop areas of deficiency in individual children). Wischmeier had indicated that Amy may have a learning disability if this program did not improve her areas of deficiency.

Wischmeier retested Amy in April 1978. The same tests were administered as before with the exception that a "Wide Range Achievement Test" was also given. Amy's test scores were in the average and

in the below average categories. The school recommended that Amy be placed in the "Learning Disabilities Resource Room" and that she remain in kindergarten one more year. In spring of 1979, the school recommended that Amy continue in the Learning Disabilities Resource Room for the next academic year. However, in September 1979, plaintiff removed Amy from the public school system and placed her in the first grade at St. John's Lutheran School. At St. John's school, Amy was provided with a tutor for one hour each day but otherwise she was taught in a regular classroom.

In September 1982, St. John's referred Amy to Thomas Palmer, a school psychologist, for an evaluation because of her academic difficulties. Palmer reviewed Amy's school records with the Perandoe school district and with the St. John's Lutheran School and found no prior diagnosis of mental impairment. At Palmer's evaluation of Amy on October 15, 1982, he noted that Amy did not have any physical abnormality or deformity. He administered a battery of psychological tests to Amy and determined her to be mildly to moderately mentally impaired. It was at this time that Palmer recommended to plaintiff that he have Amy examined by a neurologist for the possibility of seizure activity.

The foregoing evidence was presented to the jury through witnesses' testimony, by evidence depositions, and by physicians' and psychologists' reports. Additionally, Amy was presented to the jury so that they might observe her physically, but she did not testify. With this evidence before it, the jury determined that plaintiff did not misrepresent his knowledge of Amy's medical condition when he completed the insurance application.

The first issue raised by defendant is that plaintiff materially misrepresented Amy's condition on the application form making the rescission of plaintiff's insurance policy proper. The determination of whether plaintiff materially misrepresented Amy's condition by denying on the application form that she had an abnormality or deformity is a close question given the facts of this case.

It is clear from the evidence presented that Amy was not diagnosed as having Rubenstein-Taybi syndrome until January 25, 1983, after defendant had already issued plaintiff's insurance policy. The question is: Were Amy's symptoms such that they were readily apparent to plaintiff and of such a nature as to warrant plaintiff to have responded "yes" to the question on the application form about an insured having an abnormality or deformity, and if so, was plaintiff's failure to do so a material misrepresentation sufficient to void the insurance contract?

■◼■ According to section 154 of the Illinois Insurance Code (Ill. Rev. Stat. 1983, ch. 73, par. 766), the only reasons for voiding an in-

surance contract for a material misrepresentation are if the misrepresentation is "made with actual intent to deceive or materially affects either the acceptance of the risk or the hazard assumed by the company." Whether a misrepresentation is material is a question of fact for the jury and a verdict will not be set aside if there is any evidence which, standing alone, will support it. (*Mooney v. Underwriters at Lloyd's, London* (1965), 33 Ill. 2d 566, 213 N.E.2d 283.) To overturn a jury's determination, that determination must be against the manifest weight of the evidence. (*National Boulevard Bank v. Georgetown Life Insurance Co.* (1984), 129 Ill. App. 3d 73, 472 N.E.2d 80.) Additionally, it has been held that after reading a question in the light most favorable to the plaintiff, any ambiguities in a question in an application or in an insurance contract must be interpreted against the insurer. (*Gibbs v. North American Co. for Life, Accident & Health Insurance* (1971), 2 Ill. App. 3d 496, 276 N.E.2d 49.) An applicant for insurance is not expected to answer questions concerning the past and present condition of his health with the skill of a trained physician. Failure of an insured to disclose information about his health which is beyond the ken of an ordinary layman is not required if he has not been so informed about a condition by his doctor. *Logan v. Allstate Life Insurance Co.* (1974), 19 Ill. App. 3d 656, 312 N.E.2d 416.

■ From the evidence presented, we find that the jury's determination that defendant's rescission of plaintiff's insurance policy was improper was not against the manifest weight of the evidence. Plaintiff was not informed that his daughter had this rare condition until after the insurance policy was issued. Amy's symptoms that plaintiff was aware of when he applied for the insurance policy were that she was mentally slow in certain areas of learning, that she had a high arched palate, and that she had strabismus. According to Dr. Burris, none of the physical symptoms he found abnormal would be readily apparent to a layman as indicative of a medical condition. The doctor had also testified that he could not consider Amy a deformed or malformed child.

The question on the application to which defendant contends plaintiff failed to disclose information uses the words "abnormality" and "deformity." These terms, in context with the other questions on the application form, implied a physical abnormality or deformity and did not clearly state whether the abnormality or deformity to be disclosed was to be a mental or physical condition or both. We find the question relied on by defendant an ambiguous one. As such, when viewed in the light most favorable to plaintiff, the ambiguity of these terms must be resolved against defendant. Therefore, because the evidence indicated

that Amy did not have a readily apparent physical abnormality or deformity at the time plaintiff completed the application form, plaintiff did not fail to disclose material information on the application form. Further, no evidence presented indicated that Amy's medical condition would require extensive medical treatment in the future such that defendant's risk was materially affected. Therefore, we agree with the jury and find that the rescission was improper.

We next address defendant's contention that the actual damages awarded to plaintiff and Amy were improper and excessive. Defendant first contends that the award of $25,000 actual damages to Amy was erroneous, as she was not entitled to actual damages for breach of contract as a matter of law. We agree with defendant's conclusion that Amy was not entitled to actual damages but for reasons other than those urged by the defendant.

■ The general rule is that only a party to a contract or a person in privity with a party may enforce a contract. However, a third-party beneficiary may sue for breach of contract if the contract was entered into for the third party's direct benefit. If the third party's benefit is merely incidental, he has no right to sue for breach of contract. (*Metro East Sanitary District v. Village of Sauget* (1985), 131 Ill. App. 3d 653, 475 N.E.2d 1327. See also *David v. J. Elrod Realtors on Devon, Inc.* (1979), 75 Ill. App. 3d 449, 394 N.E.2d 583; *Dale v. Groebe & Co.* (1981), 103 Ill. App. 3d 649, 431 N.E.2d 1107.) As this court stated in *Metro East Sanitary District*:

> "The right of the third party benefited by a contract to sue thereon rests upon the liability of the promisor, and this liability must appear from the language of the instrument when properly interpreted and construed. The liability so appearing cannot be extended or enlarged on the ground, alone, that the situation and circumstances of the parties justify or demand further or other liability. [Citation.] As people usually stipulate for themselves, and not for third persons, a strong presumption obtains in any given case that such was their intention, and that the implication to overcome that presumption must be so strong as to amount practically to an express declaration." *Metro East Sanitary District v. Village of Sauget*, 131 Ill. App. 3d at 657-58, 475 N.E.2d at 1330.

■ Here, Amy was not an intended third-party beneficiary to the insurance contract but only an incidental beneficiary. The parties to the insurance contract were plaintiff Wayne Kohlmeier and defendant. The contract was entered into for the purpose of alleviating plaintiff's financial burden in the event that plaintiff or any of his insured depen-

dents incurred medical expenses. According to paragraph nine of the benefit provisions of the insurance contract, "all benefits payable under this Policy will be payable to the Insured." Thus Amy, as an insured dependent, was not to receive any direct monetary benefit under the contract, the only benefit granted under the policy. Since Amy was not entitled to sue for breach of contract as an incidental third-party beneficiary as a matter of law, the actual damages in the amount of $25,000 awarded to her must be reversed.

We now consider defendant's contention that the actual damages awarded to plaintiff Wayne Kohlmeier were excessive and not based on the evidence presented. We have already determined that defendant was liable to plaintiff for breach of contract, therefore the only issue we must consider is whether the actual damages in the amount of $25,000 awarded were proper.

■ It is well settled that it is a plaintiff's burden not only to establish that he sustained damages but he must also establish a reasonable basis for computation of those damages. If the party having the burden of proof fails to establish a proper basis from which to compute damages, then he is only entitled to nominal damages. Once damages have been determined by the trier of fact, a reviewing court will not disturb those findings unless the findings are against the manifest weight of the evidence. *Schoeneweis v. Herrin* (1982), 110 Ill. App. 3d 800, 443 N.E.2d 36.

"[T]he purpose of damages is to place the nonbreaching party in the position he would have been in had the contract been performed, but not to place him in a better position or provide him with a windfall recovery." (*Feldstein v. Guinan* (1986), 148 Ill. App. 3d 610, 613, 499 N.E.2d 535, 537.) Additionally, damages cannot be awarded on the basis of speculation or conjecture. *Schoeneweis v. Herrin* (1982), 110 Ill. App. 3d 800, 443 N.E.2d 36.

■ The evidence of damages presented by plaintiff at trial consisted of witnesses' testimony. The total amount of Amy's medical bills submitted by plaintiff to defendant was $3,116.50 but after the reductions allowed by the contract were subtracted, plaintiff was only entitled to $2,616.50. Evidence was presented regarding plaintiff's chiropractic bills which were submitted to defendant but were for medical services not paid by plaintiff. Additional testimony was presented that the premium required by Blue Cross/Blue Shield for an insurance policy comparable to that issued by defendant to plaintiff would be $3,645.18. However, the testimony did not establish that this amount was the actual cost of a new policy purchased by plaintiff from Blue Cross/Blue Shield two months after defendant rescinded his policy. The

annual premium paid by plaintiff for the policy issued by defendant was $2,046.68, which was refunded in its entirety to plaintiff when defendant rescinded his policy. This comprised all of the testimony presented regarding damages.

When the jury was instructed as to the law in this case, no instructions were given to the jury as to what elements should be considered when assessing damages. After deliberations, the jury found defendant had breached the insurance contract and assessed actual damages in the amount of $25,000.

Based on the substantial difference between the amount of actual damages awarded and the evidence of damages presented, we can only conclude that the jury's verdict was against the manifest weight of the evidence and that the award was based on passion and prejudice or on speculation. Although we have previously determined that defendant was liable to plaintiff for breach of contract, we cannot uphold the jury's verdict of $25,000 actual damages for plaintiff Wayne Kohlmeier. Therefore we reverse the jury's verdict and remand this cause for a new hearing on the issue of actual damages owed plaintiff. In order to remand for a new trial on damages, it must be shown that the issue of liability is separate and distinct from the issue of damages. (*Robertson v. Travelers Insurance Co.* (1981), 100 Ill. App. 3d 845, 427 N.E.2d 302, *rev'd on other grounds* (1983), 95 Ill. 2d 441, 448 N.E.2d 866.) We find that this case meets this standard as defendant's conduct is easily severable from the elements of damage suffered by plaintiff.

■■ We note that plaintiff argues that the actual damages awarded should stand as the evidence demonstrated that plaintiff suffered intentional infliction of emotional distress, a tort for which damages are not easily assessed. The evidence necessary to prove intentional infliction of emotional distress is that there be "(1) extreme and outrageous conduct, (2) intent by the defendant to cause, or a reckless disregard of the probability of causing emotional distress, (3) severe or extreme emotional distress suffered by the plaintiff, and (4) an actual and proximate causation of emotional distress by the defendant's outrageous conduct." (*Combs v. Insurance Co.* (1986), 146 Ill. App. 3d 957, 964, 497 N.E.2d 503, 508.) Plaintiff has not proved that defendant's conduct was extreme or outrageous, nor has he shown that he suffered severe or extreme emotional distress. The evidence demonstrated that the propriety of the rescission was a close case factually so defendant's conduct cannot be construed as outrageous. Further, plaintiff testified that he was "embarrassed" by defendant's actions. Embarrassment cannot be equated with severe or extreme emotional distress. Additionally, the verdict form given to the jury only asserted the breach of

contract claim as a basis for the compensatory damages, thus it must be concluded that the verdict rested on this cause of action alone.

We next address defendant's contention that the jury's verdict granting plaintiff punitive damages in the amount of $100,000 was improper. Defendant raises the following reasons as to why the punitive damages should not stand: that punitive damages cannot be awarded for breach of contract, that section 155 of the Illinois Insurance Code (Ill. Rev. Stat. 1985, ch. 73, par. 767) preempts the common law tort theory of punitive damages, and that the evidence does not support the award of punitive damages for any tort action in this case.

Plaintiff's request for punitive damages at trial rested upon count VII of his complaint. In that count, plaintiff appeared to allege that defendant breached its duty of good-faith dealing, that defendant's actions were willfully and wantonly executed, and that as a result of defendant's willful and wanton actions plaintiff suffered extreme emotional distress. On appeal, plaintiff's primary argument is that the punitive damages should remain as defendant committed the separate and independent tort of breaching its duty to act in good faith with plaintiff when it rescinded plaintiff's health insurance policy.

■■ Generally, punitive damages cannot be awarded for a cause of action of breach of contract. (*Ledingham v. Blue Cross Plan for Hospital Care of Hospital Service Corp.* (1975), 29 Ill. App. 3d 339, 330 N.E.2d 540, *rev'd on other grounds* (1976), 64 Ill. 2d 338, 356 N.E.2d 75.) Likewise, punitive damages cannot be awarded under the tort theory of intentional infliction of emotional distress. (*Knierim v. Izzo* (1961), 22 Ill. 2d 73, 174 N.E.2d 157; *Ledingham v. Blue Cross Plan for Hospital Care of Hospital Service Corp.* (1975), 29 Ill. App. 3d 339, 330 N.E.2d 540.) The only exception to the awarding of punitive damages in a breach of contract case is when there is an independent tort of failure of either party to the contract to act in good faith in its dealings with the other. *Ledingham v. Blue Cross Plan for Hospital Care of Hospital Service Corp.* (1975), 29 Ill. App. 3d 339, 330 N.E.2d 540.

Recently, numerous cases have failed to follow the holding of *Ledingham* and instead have held that section 155 of the Illinois Insurance Code has preempted any common law tort action allowing for the recovery of punitive damages. (*Combs v. Insurance Co.* (1986), 146 Ill. App. 3d 957, 497 N.E.2d 503; *Kaniuk v. Safeco Insurance Co.* (1986), 142 Ill. App. 3d 1070, 492 N.E.2d 592; *Kinney v. St. Paul Mercury Insurance Co.* (1983), 120 Ill. App. 3d 294, 458 N.E.2d 79; *Hamilton v. Safeway Insurance Co.* (1982), 104 Ill. App. 3d 353, 432 N.E.2d 996; *Hoffman v. Allstate Insurance Co.* (1980), 85 Ill. App. 3d 631, 407 N.E.2d 156; *Urfer v. Country Mutual Insurance Co.* (1978), 60 Ill.

App. 3d 469, 376 N.E.2d 1073; *Debolt v. Mutual of Omaha* (1978), 56 Ill. App. 3d 111, 371 N.E.2d 373.) Although it is this court that decided *Ledingham,* we are inclined to follow these more recent cases. At the time of deciding *Ledingham,* the language of section 155 of the Illinois Insurance Code only referred to the awarding of attorney fees and did not award any other penalty. The preemption of the common law tort actions for punitive damages by the statute was not even considered in *Ledingham* as it was not applicable. Subsequent to our deciding *Ledingham,* the legislature amended section 155 in 1977. The amendment of this section provided not only for attorney fees but it also provided that an additional penalty could be awarded in cases where an insurer's refusal or delay in payment of claims was vexatious or unreasonable. Because of this amendment, we find that the reasoning in the foregoing cases is persuasive and hold that common law tort actions seeking punitive damages have been preempted by the statute. Further, we also agree with the holding in *Hoffman* that while punitive damages are preempted by the statute, in appropriate cases, compensatory damages may be recovered for a breach of good faith and fair dealing. Therefore, in the instant case, we reverse the jury verdict awarding plaintiff punitive damages in the amount of $100,000 for the tort of unfair dealing and bad faith as it is contrary to law.

■ Additionally, even if section 155 does not preempt punitive damages, punitive damages would not be justified in this case. Under *Ledingham,* to be awarded punitive damages, a plaintiff must prove that the insurer breached its duty to act in good faith and to deal fairly with him. Here, plaintiff has not sustained that burden. We have previously held that the determination regarding whether the rescission of the insurance policy was improper was a close question; therefore, it cannot be said that the defendant acted in bad faith when it rescinded the policy. The defendant's actions rested on the doctor's report on Amy in which he stated that her condition was congenital. The medical dictionary defined her syndrome as being characterized by physical and mental abnormalities. On the basis of this information it was reasonable that the defendant concluded that the plaintiff should have been aware of symptoms of Amy's condition and that he misrepresented her medical history when he completed the application form.

Punitive damages are awarded when a tort is committed with fraud, actual malice, deliberate violence or oppression, or when a defendant acts in a willful or grossly negligent manner such as to indicate a wanton disregard of others. (*Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353.) "The purpose of imposing punitive damages is to punish the defendant, to teach him not to repeat his inten-

tional, deliberate and outrageous conduct, and to deter others from similar conduct." (*Cornell v. Langland* (1982), 109 Ill. App. 3d 472, 475, 440 N.E.2d 985, 987.) Punitive damages are similar to a criminal penalty and not favored under the law. (*Cornell v. Langland* (1982), 109 Ill. App. 3d 472, 440 N.E.2d 985.) Plaintiff has not proven that defendant committed an independent tort warranting punitive damages. Defendant was not acting in bad faith when it rescinded plaintiff's insurance policy but was acting in a reasonable fashion from the information it had obtained. Punitive damages cannot be awarded to punish or to deter reasonable actions simply because of an error in judgment. Insurers are entitled to exercise their rights in a legally permissible way. (*Fisher v. Fidelity & Deposit Co.* (1984), 125 Ill. App. 3d 632, 466 N.E.2d 332.) Therefore the punitive damages should be reversed under the reasoning of *Ledingham* regardless of the language of section 155.

■■ Defendant's last contention is that the circuit court abused its discretion when it awarded plaintiff attorney fees in the amount of $5,000. On November 15, 1985, the circuit court entered an order in which it granted plaintiff attorney fees because it found that defendant's delay in paying plaintiff's claims under the insurance policy was vexatious and unreasonable and therefore allowed under section 155 of the Illinois Insurance Code. (Ill. Rev. Stat. 1985, ch. 73, par. 767.) The circuit court's determination was founded on the evidence adduced at trial. No separate hearing on this issue was held.

Section 155, on which the circuit court relied, states as follows:

"(1) In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:

(a) 25% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;

(b) $5,000;

(c) the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action." (Ill. Rev. Stat. 1985, ch. 73, par. 767.)

Whether an insurer's actions are vexatious and unreasonable is a question of fact, the determination of which is discretionary with the circuit court after it has considered and assessed the totality of the circumstances. (*Herrera v. Benefit Trust Life Insurance Co.* (1984), 126 Ill. App. 3d 355, 466 N.E.2d 1172.) A circuit court's determination will not be overturned on appeal unless it is found that the circuit court abused its discretion; however, a reviewing court may apply its own judgment in considering the propriety of attorney fees. (*Songer v. State Farm Fire & Casualty Co.* (1982), 106 Ill. App. 3d 141, 435 N.E.2d 948.) In making its determination, a circuit court should consider the insurer's attitude, whether an insured was forced to file suit to recover, and if an insured was deprived of the use of his property. "However, if there is a *bona fide* dispute about coverage, delay in settling a claim may not violate the statute." *Mohr v. Dix Mutual County Fire Insurance Co.* (1986), 143 Ill. App. 3d 989, 999, 493 N.E.2d 638, 645.

Considering the facts in this case, we cannot say that defendant's refusal to pay was vexatious and unreasonable. Defendant's affirmative defense of plaintiff's making a material misrepresentation on his insurance application form presented a *bona fide* dispute. Defendant should not be penalized for seeking a judicial determination of the question. Therefore, we reverse the circuit court's determination allowing plaintiff attorney fees in the amount of $5,000.

Lastly, it should be noted that defendant has presented an alternative argument in which it seeks a new trial. Because of our determination in this case, we need not consider defendant's alternative argument.

For the foregoing reasons, we affirm the judgment of the circuit court of St. Clair County with regard to defendant's liability under the insurance contract but reverse those judgments with regard to compensatory damages, with regard to punitive damages, and with regard to attorney fees and remand this cause for a determination of the compensatory damages to which plaintiff is entitled.

Affirmed in part; reversed and remanded in part.

KARNS and WELCH, JJ., concur.