BOCKMAN PRINTING AND SERVICES, INC., Plaintiff-Appellee, v. BALDWIN-GREGG, INC., *et al.*, Defendants-Appellants.

First District (6th Division)   No. 1—89—3021

Opinion filed May 3, 1991.

Neuman, Williams, Anderson & Olson, of Chicago (Gregory B. Beggs and Daniel J. Krieger, of counsel), for appellants.

Hill, Van Santen, Steadman & Simpson, of Chicago (Stephen B. Ruben, David C. Thollander and Randy Erickson, of counsel), for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Defendants, Baldwin-Gregg, Inc., and Baldwin Technology Corp., appeal from the trial court's order granting summary judgment on liability in favor of plaintiff. After a bench trial as to damages only, the trial court awarded damages to plaintiff in the amount of $181,338.16. Defendants also appeal the award of damages. Plaintiff cross-appeals, alleging that the trial court applied the wrong period for damages and erred in denying its claim for outside bindery charges.

Plaintiff, Bockman Printing and Services, Inc., is a company which prints and mails advertising for its customers. In the late 1970's and early 1980's, Anthony and Robert Perrone, plaintiff's executive vice-president and president, respectively, attempted to purchase a folding machine that would attach to its Didde Glaser Webb press (Didde press) and fold printed material at the same rate as the press. At the time, the Didde press printed material which was transported to another area where other machines folded it. The Perrones believed that an in-line attached folder would increase plaintiff's production capacity, reduce cost, time and labor and result in substantial savings to its customers.

Beginning in about 1978, plaintiff attempted to purchase such an in-line folder. Custom-Bilt, a New York company, built and installed a folder in 1981, which ran only at one-third the rate of the Didde press. A subsequent attempt by Custom-Bilt to rebuild the folder also failed. In 1984, plaintiff consulted with the Vijuk Company, which, in 1985, installed an in-line folder which was also unsatisfactory.

Plaintiff contacted defendants in 1982. Defendants' engineering manager, engineers and salesman visited plaintiff's plant, viewed and took measurements of the Didde press. Plaintiff explained the type of folds it sought to make, and defendants' agents assured plaintiff that they could produce and guarantee the folder.

Based upon these preliminary meetings, defendants prepared a proposal, dated July 13, 1982, which provided that defendants would design a "double chopper folder" according to plaintiff's specifications. It further provided that: "[T]he folder, after being built, but before delivery, would be 'tested at the [defendants'] factory prior to shipment and you will be invited to witness tests.' " A guarantee clause provided that if the folder did not perform the folds according to specifications, defendants would refund to plaintiff all monies paid. On a separate page, defendants indicated: "In no event shall we be liable for any contingent or consequential charges or damages." The proposal's "estimated delivery" was six months after defendants received the order, down payment and necessary engineering information. Defendants' August 11, 1982, letter to plaintiff repeated the payment terms. In a letter dated August 23, 1982, Anthony Perrone accepted defendants' offer to build the double chopper folder. His letter provided: "We also would expect all of our money back if at any time or for whatever reason the folder does not do an acceptable job," defining "acceptable" as operating at the same speed as the Didde press. On September 8, 1982, defendants sent plaintiff a letter which stated: "[Defendants] will do everything possible to make this a

successful installation, but will not be liable for any contingent or consequential charges or damages." The trial court found that the July proposal and the two August letters comprised the contract.

Defendants thereafter stated that design work was proceeding and projected February 1983 as the completion date and April 1983 as the shipping date. The folder, however, was not delivered in April 1983. Defendants' July 6, 1983, letter assured plaintiff that defendants could make the folder and promised delivery by September 1, 1983. In September 1983, defendants telephoned plaintiff, asking what color to make the folder.

In October 1983, the Perrones viewed a demonstration of the then-existing folder at defendants' place of business. The folder failed to operate at a high enough speed and failed to meet the fold accuracy requirements. Plaintiff informed defendants that the folder was not acceptable.

On December 15, 1983, defendants advised plaintiff that they had been unsuccessful in constructing a folder to meet plaintiff's requirements and had "exhausted all technical approaches known to [them]," spending more than $70,000 in their efforts. Defendants also issued a check to return plaintiff's down payment.

Plaintiff filed suit against defendants on May 16, 1984. The complaint, as amended, consisted of six counts: wrongful repudiation of the agreement; breach of the agreement; failure to act in good faith; improper attempt to limit consequential damages; breach of implied warranties of merchantability; and breach of fitness for a particular purpose.

After a hearing on the parties' cross-motions for summary judgment, the trial court granted summary judgment in favor of plaintiff on the issue of liability. Subsequently, a trial proceeded solely on the issue of damages.

At the trial on damages, plaintiff sought recovery for cover under section 2—711 of the Uniform Commercial Code (UCC) (Ill. Rev. Stat. 1989, ch. 26, par. 2—711) for the purchase of two Baum folders and a Vijuk folder. Plaintiff also sought consequential and incidental damages under section 2—715 of the UCC, consisting of outside folding costs, payroll overtime charges, and the cost of an extra employee. Finally, plaintiff sought recovery of its down payment.

The trial judge determined that the applicable period of damages was February 1983 through December 1983, and awarded the following damages: (1) $34,000 for the two Baum folders; (2) $56,275 for the Vijuk folder; (3) $67,485.66 for overtime; (4) $8,640 for an addi-

tional employee; and (5) $14,937.50 for return of plaintiff's down payment.

PLAINTIFF'S DAMAGES

We summarize below the most relevant evidence adduced at the damages trial.

Anthony Perrone and William Marshall each testified that plaintiff's equipment folded off-line at a cost of $3 per thousand and that the double chopper folder would reduce the cost and enable plaintiff to charge customers $1 per thousand for folding. According to Perrone, plaintiff instructed its sales staff to use this as a price advantage and commit itself based upon this rate for work coming in as of February 1983.

Anthony Perrone estimated that plaintiff's business increased by 300% during this period. Marshall testified that business began to increase in February 1983, but he did not know the dollar volume. Although no records existed to document this increase, his conclusion was "based upon [his] knowledge of being in there and fighting the battle." He said that things became more manageable and began to return to normal in March 1985.

Morris Elstein, plaintiff's vice-president of sales, testified that he and his sales staff started making quotes to customers based upon the new rate soon after the parties contracted for in-line equipment. He explained that many of plaintiff's contracts with customers were entered "prior to the actual job coming into the plant." According to Elstein, the price quoted for a job was based upon many variables besides folding. Although plaintiff realized that the folder would not be delivered toward the end of 1983, it honored its existing contracts even at the lower folding rate. When possible, plaintiff adjusted the price in order to maintain profitability, minimize loss and keep both printing and mailing aspects in-house. Although plaintiff's long-term contracts allowed for price adjustments, Elstein could not estimate the percentage of such contracts during the damages period because "the answer is all over the board."

In order to alleviate the overload and meet its contractual obligations, plaintiff sent work to outside binderies; purchased three off-line folders; incurred overtime charges in its in-house bindery; and hired an employee to carry printed stock from the Didde press to plaintiff's off-line folders and then to the warehouse.

The following evidence was adduced at trial with respect to the alleged elements of damages.

### 1. VIJUK FOLDER

William Marshall, plaintiff's production manager, testified that plaintiff purchased the Vijuk folder in the latter part of 1984 for "around $55 or 57 thousand." Anthony Perrone testified that plaintiff purchased the Vijuk folder in March 1985. According to Marshall, the Vijuk folder was capable of making the same folds as the double chopper folder, in addition to a variety of other folds. He stated:

> "[T]here is a multitude of folds that it could make. *** It would fold the four-page signatures. It would fold 16-page signatures, books. It would fold letter size folds for No. 10. It would fold 5½, 8½. It would fold to 9 x 12's. It would fold to just whatever you can figure."

Anthony Perrone also testified that the work done on the Vijuk folder was interchangeable with that done on the Baum folder. He agreed that there were times when plaintiff ran jobs from a press other than Didde press on the Vijuk folder. No bill of sale, receipt or other documentary evidence was introduced by plaintiff regarding the purchase of the Vijuk folder.

### 2. TWO BAUM FOLDERS

Marshall testified that plaintiff purchased two used Baum folders in 1984 for $13,500 and he "believed" $15,000, respectively, in order "to get a handle on the overload" in the shop. The Baum folder was capable of making the same folds that the double chopper folder would have made. In addition, the Baum folders could be adjusted to make a variety of different types of folds.

Anthony Perrone testified that plaintiff used the Baum folders "basically *** to fold material that came off Didde Glaser," although he agreed that they probably folded work from other presses.

Plaintiff introduced no documentary evidence for its purchase of the Baum folders.

### 3. IN-HOUSE BINDERY OVERTIME

Eugene Schoefernacher, plaintiff's personnel manager, compiled the exhibit which demonstrates the bindery department's payroll for hourly employees from September 1982 through October 1985. He does not, however, participate in the bindery operations and deals only with the payroll records.

Marshall, who was responsible for approving overtime, testified that employees from the bindery department are not shifted to other divisions of the plant and that bindery overtime does not reflect any

work done on the presses. He also stated that the bindery department in early 1982 contained a variety of different types of equipment including four folders, two cutters and stitching and padding equipment. In early 1982 plaintiff owned six presses, including the Didde press. Plaintiff's bindery work came from all of its presses and some of the overtime work in plaintiff's bindery came off presses other than the Didde press. He could not distinguish from the overtime records between overtime for stock printed on the Didde press and overtime for stock printed on other presses.

#### 4. OUTSIDE BINDERY CHARGES

Marshall testified that in January 1983 "the volume" was 10 million finished pieces. In February 1983, plaintiff began to have trouble meeting delivery dates and by March 1983, "it got out of hand." This increase in volume, which, according to Marshall, resulted from the absence of the promised folder, forced plaintiff to hire outside binderies to assist. Plaintiff regularly relied upon outside binderies to do work that plaintiff's in-house bindery could not perform, such as perfect bind, special bind and water seal. When Marshall hired outside binderies during this time, he instructed them to do all the work to completion, which may have included "a multitude of things," such as folding, stitching, gluing, scoring and cutting. Because plaintiff was "overloaded" and "scrambling to meet delivery dates," it was cheaper to permit outside trade binderies to do all the work. Marshall estimated that 80% of this outside bindery work was for folding. He initially stated that plaintiff could have done this work in-house for 80% of the outside binderies' charges, but later changed this estimate to 50%.

Plaintiff introduced three exhibits purporting to document outside bindery charges for 1983 through 1985 which resulted from defendant's failure to produce the double chopper folder. These exhibits comprised invoices sent from outside binderies to plaintiff, and did not apportion the cost between folding and nonfolding services. The court found the exhibits "hopeless" and suggested that plaintiff redo them. Plaintiff amended the exhibits to apportion an amount to folding, relying on Marshall, who estimated the approximate folding cost on each invoice based upon his personal knowledge. His calculation was sometimes based upon his memory that the customer typically requested only a particular type of service or the outside bindery handled only a particular type of printing. When Marshall could not recall the job on the invoice, he allocated 82% of the cost to the folding, referring to this percentage as a "trade custom." Marshall then multiplied the to-

tal folding cost by two-thirds, which represents the difference between what the outside binderies charged and the one dollar it would have cost plaintiff to fold in-house with the double chopper folder. Marshall testified that because outside binderies charged at least $3 per thousand for folding and the double chopper folder would have done the folding for $1 per thousand, plaintiff lost $2 per thousand on the work it sent outside its plant.

Marshall admitted that many of the invoices did not indicate whether folding was done or whether the paper size was one that the double chopper folder could have handled. He stated that many of the jobs could not have been folded on the double chopper folder either because of the sheet size or the need for die cuts or pocket configurations. He also testified that the invoices did not indicate what other services were rendered to plaintiff by the outside binderies.

### 5. ADDITIONAL EMPLOYEE

Marshall testified that plaintiff hired a material handler to carry printed stock from the Didde press to the bindery's in-line folders and then from the bindery to the warehouse. He stated that this employee worked in the bindery 40 hours per week throughout all of 1983 and 1984, earning $4.50 per hour. Plaintiff requested damages for this additional employee for the period from February 1983 through December 1984. Plaintiff did not introduce into evidence payroll records or time cards for the employee.

Defendants contend on appeal that the trial court improperly granted summary judgment because there were genuine, material issues of fact under each count of plaintiff's third amended complaint; that the trial court erred in denying defendants' cross-motion for summary judgment; and that plaintiff's damage claims were too speculative and, therefore, should have been denied by the trial court.

Plaintiff filed a cross-appeal, alleging that the trial court erred in limiting the damages period to December 31, 1983, and denying its damages for outside bindery charges.

Because we agree with defendants that plaintiff did not prove its damages, we deem it unnecessary to consider defendants argument that the trial court erred in awarding summary judgment to plaintiff.

■ Initially, we note that a reviewing court will not disturb a trial court's findings as to damages unless its measure of damages was erroneous as a matter of law or the trial court ignored the evidence. (*Schatz v. Abbott Laboratories, Inc.* (1972), 51 Ill. 2d 143, 281 N.E.2d 323; *Beaton & Associates, Ltd. v. Joslyn Manufacturing & Supply Co.* (1987), 159 Ill. App. 3d 834, 512 N.E.2d 1286.) A party

seeking to recover damages in a breach of contract action must establish that he sustained damages and must provide a reasonable basis for computing those damages. (*Kohlmeier v. Shelter Insurance Co.* (1988), 170 Ill. App. 3d 643, 525 N.E.2d 94; *Brewer v. Custom Builders Corp.* (1976), 42 Ill. App. 3d 668, 356 N.E.2d 565.) We conclude that plaintiff here suffered no actual damages as a result of defendant's breach, and even assuming that plaintiff did sustain damages, it failed to provide a reasonable basis for the computation of those damages.

I. DAMAGES FOR COVER: THE TWO BAUM FOLDERS AND THE VIJUK FOLDER

■ The testimony of plaintiff's agents established that its business volume increased when it began to offer reduced folding costs to its customers after entering the contract with defendants. Plaintiff alleges that defendants' failure to build the double chopper folder as proposed and the greater workload required plaintiff to purchase the three off-line folders which it claimed as damages. We disagree. In our view, defendants' breach did not harm plaintiff. Rather, plaintiff initiated a successful sales promotion and purchased the folders in order to handle the resultant influx in business volume. We do not believe that plaintiff thereby suffered. The record indicates that these folders could make a "multitude of folds," and adequately handled the folding jobs coming off the Didde and other presses. Their usefulness and adaptability to plaintiff's operations, which were 90% to 95% letter printing and folding, is apparent. In fact, plaintiff already owned several similar Baum folders. Further, the record does not indicate that the three in-line folders were discarded, unusable or unnecessary subsequent to the damages period. Given plaintiff's evidence that letter printing and folding constituted the bulk of its business, we cannot conclude that the purchase of off-line folders injured plaintiff.

Even assuming plaintiff suffered an injury, we do not believe that its purchase of the folders under these facts was reasonable cover under the Uniform Commercial Code. Section 2—712 authorizes a buyer to effect cover by "making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods *in substitution for those due from the seller.*" (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 26, par. 2—712.) The three in-line folders were not, in our opinion, a substitute for the double chopper folder under the concept of cover. (See *Draper v. Minneapolis-Moline, Inc.* (1968), 100 Ill. App. 2d 324, 241 N.E.2d 342.) Plaintiff contracted with defendants to design and deliver a specially manufactured in-line folder to operate

with its Didde press at a specified rate and accuracy. The advantage of such an in-line folder was its ability to fold at the same rate as the Didde press. Despite defendants' substantial efforts and $70,000 expenditure, the machine failed. The three off-line folders plaintiff subsequently purchased did not attach in-line to the Didde press, did not operate at a similar speed, and did not give plaintiff a manufacturing cost advantage. In fact, plaintiff already owned two similar Baum folders prior to 1983. Under these facts, plaintiff's purchase was not a reasonable substitute or replacement for the proposed double chopper folder.

Further, the facts do not suggest that plaintiff's purchase of the folders occurred "without unreasonable delay," as required by the Code. Although the trial court found that defendants breached in December 1983, Marshall testified that plaintiff purchased the Vijuk folder in the latter part of 1984 while Anthony Perrone testified that it was purchased in March 1985. The Baum folders were purchased "sometime in 1984." Given that plaintiff viewed a failed test of the then-existing folder in October 1983, and was informed in December 1983 that defendants were terminating their efforts to build, we cannot say that plaintiff purchased the folders without unreasonable delay under the statute. (*Cf. Lyntel Products v. Alcan Aluminum Corp.* (1981), 107 Ill. App. 3d 176, 437 N.E.2d 653 (plaintiff "immediately" proceeded to find substitute upon realization that defendant could not meet its obligation).) Thus, even assuming plaintiff suffered injury, these purchases were not reasonable cover under the statute. The trial court incorrectly awarded damages to plaintiff for the purchase of the three folders.

## II. CONSEQUENTIAL AND INCIDENTAL DAMAGES

The trial court also awarded plaintiff overtime charges and the cost of an additional employee, without specifying whether they were incidental or consequential damages. Section 2–715 of the UCC provides:

> "§2–715. Buyer's Incidental and Consequential Damages. (1) Incidental damages resulting from the seller's breach include *** any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.
>
> (2) Consequential damages resulting from the seller's breach include (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be pre-

vented by cover or otherwise \*\*\*." Ill. Rev. Stat. 1989, ch. 26, par. 2—715.

A central question in awarding consequential damages is whether defendant "ha[d] reason to know" either the "general or particular requirements" and needs of plaintiff when the contract was entered into. This court in *Adams v. J.I. Case Co.* (1970), 125 Ill. App. 3d 388, 406, 261 N.E.2d 1, 9, warned against adhering strictly to the Code's meaning, stating: "Rather, each case is to be considered on its merits, touching upon the issue of special circumstances arising in that particular case." We believe that defendants under the circumstances had no reason to believe that plaintiff would make quotes and enter contracts based upon defendants' promise to design and build a double chopper folder by February 1983. Two companies had attempted and failed to produce such an in-line folder to meet plaintiff's specifications. Reasonable skepticism based upon past experience and good business practice would require plaintiff to wait until some initial indicia of success was demonstrated. Indeed, the agreement required defendants to test the folder in plaintiff's presence before delivery. The record does not indicate that defendants knew or could reasonably expect plaintiff to enter into contracts months prior to the anticipated delivery date. Nor do we believe that plaintiff's course of action was "commercially reasonable" under section 2—715(1).

Moreover, a nonbreaching party to a contract is generally only entitled to damages which "arise naturally from the breach itself, or such as may reasonably be supposed to have been within the contemplation of the parties at the time of making the contract as a probable result of a breach thereof." (*Sitnick v. Glazer* (1956), 11 Ill. App. 2d at 467-68, 138 N.E.2d 84, 88; 25 C.J.S. *Damages* §24 (1966).) As indicated in the previous section, we cannot conclude that plaintiff's alleged damages arose naturally or flowed directly from the breach. Nor can we say that the parties contemplated such damages as a possible result of the breach. Indeed, plaintiff's acceptance letter of August 1982 stated: "We would also expect all of our money back if at any time or for whatever reason the folder does not do an acceptable job." Further, defendants' September 8, 1982, letter indicated that they waived responsibility for incidental or consequential damages. Although the trial court found that defendants' letter did not constitute part of the parties' agreement, the evidence suggests that plaintiff did not contemplate damages if defendants failed to produce the folder, but instead required only a return of its down payment. Alleged damages resulting from plaintiff's aggressive sales promotion were obviously not contemplated by either party at the time of contracting. We

therefore conclude that the overtime and extra employee costs, whether consequential or incidental damages, did not flow from defendants' breach nor were they contemplated by the parties at the time of contracting.

■ Moreover, even if plaintiff in its need for overtime work was actually damaged by defendants' breach, plaintiff failed to prove the amount with reasonable certainty. Although the UCC does not require plaintiff to prove consequential damages with "mathematical precision" (*Cates v. Morgan Portable Building Corp.* (7th Cir. 1979), 591 F.2d 17, 21), basic contract theory requires that damages must be proved with reasonable certainty and precludes damages based on conjecture and speculation. (*Kohlmeier v. Shelter Insurance Co.*, 170 Ill. App. 3d 643, 525 N.E.2d 94.) The evidence shows that plaintiff folded material from each of its six presses in its bindery department. The evidence also indicates that plaintiff's bindery housed more than folding equipment, namely cutting, padding, handstitching, gluing and collating equipment. Neither the exhibits nor the testimony demonstrates the amount of the overtime attributable to work from the Didde press or apportions overtime work between the bindery's various functions. The evidence does not form a sufficient basis upon which damages can be calculated.

■ Plaintiff also failed to establish a sufficient causal connection between defendants' breach and plaintiff's cost for an additional employee. Plaintiff hired this employee to carry printed materials from the Didde press to the folding area and then to the warehouse. Although an optimally operable double chopper folder attached to the Didde press would have precluded the need for such employee, we cannot conclude that this expenditure by plaintiff was the direct, immediate and probable result of defendants' breach.

■ Nor can we conclude that plaintiff proved this alleged element of damage with reasonable certainty. The evidence demonstrates that this person not only carried materials from the Didde press to the bindery, but also brought finished products to the warehouse. The evidence does not indicate that all of the products handled by the employee could have been folded on the proposed double chopper folder. Nor does it apportion the employee's time between that required to move materials to the bindery and that required to move materials to the warehouse.

Plaintiff argues, relying upon sections 2—715 and 1—106 of the UCC (Ill. Rev. Stat. 1989, ch. 26, pars. 1—106, 2—715), that its proof of damages was "reasonable under the circumstances" and thus permissible under the UCC. The UCC, however, does not vitiate the rule

that damages be proved with reasonable certainty, which we do not here perceive. Nor do we accept plaintiff's suggestion that defendants' breach made exact calculations difficult. The trial court erred in awarding plaintiff damages for in-house bindery overtime and for an extra employee.

### III. PLAINTIFF'S CROSS-APPEAL

Plaintiff on cross-appeal claims that the trial court erred in denying its claim for outside bindery charges and in limiting the damages period to December 1983. In view of our above findings, it is unnecessary to consider plaintiff's argument as to the damages period.

As to outside bindery charges, plaintiff admits that it sent jobs to outside binderies during this period that could not have been done on the double chopper folder. Plaintiff argues, however, that defendants' failure to deliver the folder resulted in an overload situation which required it to send out all types of work in order to meet its deadlines. Plaintiff maintains that its inability to specifically identify work sent out as that which the double chopper folder could have done is not fatal to its claim.

■ We disagree and conclude that plaintiff failed to establish these charges as actual damages and failed to prove their amount with reasonable certainty. As stated above, plaintiff actively pursued a marketing strategy to increase its business based upon its anticipated ability to reduce its folding charges to its customers. Plaintiff's increased volume and resort to outside binderies for assistance in meeting its overload, although related to the advent of the folder, did not result from defendants' breach. Thus, plaintiff suffered no actual damage.

Moreover, plaintiff's attempt to calculate damages for outside binderies was speculative. In denying these damages, the trial court found:

> "[T]he evidence of outside bindery charges for folding is not, in the Court's opinion, credible in any respect. The jumble of figures, the exhibits offered, amended, and in some cases withdrawn, *** leave the Court with no alternative but to find zero damages for the plaintiff. Hundreds of pages were taken up with seemingly endless questions only to demonstrate to this Court that in this category plaintiff has not met its burden of proof."

We agree with the trial court's characterization of the evidence. Plaintiff simply failed to sufficiently link its outside binding costs to defendants' breach. In short, plaintiff's proof created little more than

a speculative inference of the extent of its alleged injury. *Hoefferle Truck Sales, Inc. v. Divco-Wayne Corp.* (7th Cir. 1975), 523 F.2d 543.

■ Finally, we uphold the trial court's award of $14,937.50 to plaintiff for the return of its down payment. The parties' understanding at the time of contracting requires this and apparently defendants do not dispute that they owe plaintiff this money.

Accordingly, we affirm that portion of the order of the circuit court of Cook County awarding plaintiff $14,937.50 for the return of its down payment. We reverse all other portions of the order which awarded damages to plaintiff.

Judgment affirmed in part and reversed in part.

EGAN and LaPORTA, JJ., concur.