HARLEY EMERSON *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. AMERICAN BANKERS INSURANCE COMPANY OF FLORIDA, Defendant-Appellant and Cross-Appellee.

Fifth District   No. 5—89—0787

Opinion filed January 29, 1992.

930

Thomas F. Crosby, of Winters, Brewster, Murphy, Crosby & Patchett, of Marion, for appellant.

Douglas N. Dorris, of Harris & Lambert, of Marion, for appellees.

JUSTICE RARICK delivered the opinion of the court:

Plaintiffs, Harley Emerson and Rogelio Arcuino, brought an action in the circuit court of Pope County against American Bankers Insurance Company of Florida (American) for refusing to pay the full cash value of a $50,000 livestock insurance policy covering a standardbred stallion named Tough Cookie. The initial complaint alleged breach of contract. Pursuant to policy provisions, the dispute was submitted to arbitration and plaintiffs were awarded $40,000. Plaintiffs thereupon added additional counts to their complaint, seeking damages under section 155 of the Illinois Insurance Code (Ill. Rev. Stat. 1987, ch. 73, par. 767) and damages for breach of the duty of good faith and fair dealing. The trial court dismissed the breach of contract claim and entered judgment on the arbitration award. Plaintiffs subsequently added another count seeking damages for intentional infliction of emotional distress. Prior to trial, the trial court denied American's motion *in limine* to exclude evidence that the horse had a value greater than that awarded by arbitration, and the court granted plaintiffs' motion *in limine* to exclude evidence of the arbitration award.

Emerson and Arcuino were in the business of breeding horses. Plaintiffs testified that a premier stallion was vital to the operation's success. According to the record, Tough Cookie was purchased in 1983 to fulfill this role. Plaintiffs obtained insurance from American through Classic Insurance Company, a Kentucky insurance agency. Livestock policies were rewritten each year, and in 1985 Classic sent Emerson an application requesting, *inter alia,* the number of mares serviced in 1985. According to the application, Tough Cookie serviced 27 mares in 1984 and was to service 30 in 1985. A $50,000 policy was issued in March of 1985 covering any claim made while the horse was in the United States or Canada. Tough Cookie died in January of 1986. Included with plaintiffs' proof of loss were breeding reports for 1984 and 1985, which indicated that Tough Cookie had serviced 20 mares in 1984 and 19 in 1985, 12 of which were owned by plaintiffs. Because of the discrepancy between the application and the breeding reports, American had Tough Cookie appraised by two appraisers. They valued the horse at $10,000 and $15,000, respectively, but considered only the market in the United States and Canada. Emerson

also obtained two appraisals of Tough Cookie, one for $50,000 and one for $55,000. These appraisers testified that their appraisals were based upon sale in the European market.

American rejected plaintiffs' proof of loss. According to the rejection letter, the bases for American's decision were:

"1. The insurance policy is based on actual cash value at the time of death. Although the two appraisals that you furnished the insurance company on your behalf reflected a value of $50,000 to $55,000, these appraisals were based on the animal being shipped overseas. Even if this transaction would have taken place during the policy period, there still would have been shipping costs, fees, commissions, import tax, etc. It is apparent that these costs would have made it uneconomical to the seller.

2. Misrepresentation regarding the application for insurance. The application that you prepared stated that the stallion services 27 mares during 1984 and had serviced 30 mares in 1985. However, our investigation revealed that 20 mares were bred to the stallion in 1984 and 19 mares were bred in 1985. The animal's stud fee was listed at $1000[;] however, the majority of the mares were either owned by you or Dr. Arcuino. It is apparent that the revenue that was generated by the stallion in 1985 was very minimal."

The letter made a settlement offer of $25,000. Plaintiffs refused and this suit followed.

At trial, Tom Keller, the adjuster, testified that Skip Whitlock, American's director of casualty claims, made the decision not to consider the overseas market because Tough Cookie was never overseas and because plaintiffs' appraisers did not take into account exportation costs in making their appraisals. Whitlock testified that in 1986 he had no knowledge of an overseas market for trotters, nor was he aware of any custom or practice regarding who paid export costs. Whitlock further testified that he did not feel that plaintiffs' appraisals were relevant because the horse was in the United States at the time of death. Tony Sholes, American's senior claims supervisor, and Keller also testified that they were not familiar with the overseas market.

After rejection of the claim, Emerson obtained a replacement stud named San Phillipe for $9,500. Emerson indicated that a stallion closer to Tough Cookie's stature could have been obtained had American paid the full policy amount. San Phillipe had never raced, had no breeding performance record, and generated much lower revenues.

Emerson testified that Arcuino was very upset and angry when told that American would not pay full policy proceeds. Emerson also testified that he too was angry and upset and had argued with Keller numerous times. He stated that Keller told him that American would not go beyond $25,000 and that he might just as well hire an attorney because American "[had] lawyers just sitting around doing nothing." Keller denied this. Janet Emerson testified that her husband has been short-tempered and irritable since this incident, but she admitted that he never sought any type of medical treatment.

The jury found in favor of plaintiffs and awarded them $45,000 on count III and a total of $55,000 on count IV. The trial court entered judgment thereon and awarded plaintiffs $33,072.23 on their section 155 claim. American appeals.

American first argues that plaintiff's complaint failed to state a cause of action for breach of the duty of good faith and fair dealing. American maintains that compensatory damages for breach of the duty of good faith and fair dealing are preempted by section 155 of the Illinois Insurance Code (Ill. Rev. Stat. 1987, ch. 73, par. 767) unless the alleged breach involves conduct other than that prescribed by statute. Section 155 provides in pertinent part:

"(1) In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:

(a) 25% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;

(b) $25,000;

(c) the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action." Ill. Rev. Stat. 1987, ch. 73, par. 767.

There has been considerable disagreement both among the various divisions of our appellate court and among numerous Federal district court decisions over the preemptive effects of section 155. (*W.E. O'Neil Construction Co. v. National Union Fire Insurance Co.* (N.D. Ill. 1989), 721 F. Supp. 984.) In *Ledingham v. Blue Cross Plan*

*for Hospital Care of Hospital Service Corp.* (1975), 29 Ill. App. 3d 339, 330 N.E.2d 540, *rev'd on other grounds* (1976), 64 Ill. 2d 338, 356 N.E.2d 75, this court held that punitive damages could be recovered from an insurer who breaches its duty to act in good faith. The effect of section 155 was not addressed as it was inapplicable, because at the time *Ledingham* was decided, section 155 provided for an award of attorney fees but no other penalty.

The General Assembly, in 1977, amended section 155 to provide for the imposition of additional penalties where an insurer's refusal or delay in payment of claims was vexatious or unreasonable. Several subsequent decisions of the appellate court declined to follow *Ledingham,* holding that section 155 preempts any common law action based upon breach of the implied covenant of good faith and fair dealing, and that damages were limited to those provided by section 155. *Combs v. Insurance Co. of Illinois* (1986), 146 Ill. App. 3d 957, 497 N.E.2d 503; *Trautman v. Knights of Columbus* (1984), 121 Ill. App. 3d 911, 460 N.E.2d 350; *Kinney v. St. Paul Mercury Insurance Co.* (1983), 120 Ill. App. 3d 294, 458 N.E.2d 79; *Hamilton v. Safeway Insurance Co.* (1982), 104 Ill. App. 3d 353, 432 N.E.2d 996; *Tobolt v. Allstate Insurance Co.* (1979), 75 Ill. App. 3d 57, 393 N.E.2d 1171.

Both *Kaniuk v. Safeco Insurance Co.* (1986), 142 Ill. App. 3d 1070, 492 N.E.2d 592, and *Debolt v. Mutual of Omaha* (1978), 56 Ill. App. 3d 111, 371 N.E.2d 373, held that section 155 preempted punitive damages but left open the question of whether section 155 preempted compensatory damages for breach of the duty of good faith and fair dealing.

Other decisions have held that section 155 preempts punitive damages, but not compensatory damages. (*Calcagno v. Personalcare Health Management, Inc.* (1991), 207 Ill. App. 3d 493, 565 N.E.2d 1330; *McCall v. Health Care Service Corp.* (1983), 117 Ill. App. 3d 107, 452 N.E.2d 893; *Hoffman v. Allstate Insurance Co.* (1980), 85 Ill. App. 3d 631, 407 N.E.2d 156.) Addressing the effect of the amendment to section 155, this court, in *Kohlmeier v. Shelter Insurance Co.* (1988), 170 Ill. App. 3d 643, 525 N.E.2d 94, departed from *Ledingham,* holding that common law tort actions seeking punitive damages have been preempted by the statute. Citing agreement with *Hoffman,* however, this court further held that in appropriate cases, compensatory damages might be recovered for a breach of the duty of good faith and fair dealing. (*Kohlmeier,* 170 Ill. App. 3d at 657, 525 N.E.2d at 104.) We reaffirm that position today, and to the extent our holding conflicts with the positions taken by the other districts of this court, we decline to follow them. The question of what type of con-

duct will support a recovery of compensatory damages leads us to American's second argument: Whether plaintiffs allege the necessary elements to state a claim for breach of the duty of good faith and fair dealing.

What constitutes bad faith depends largely upon the particular circumstances of the case, particularly the insurer's conduct and its reasons for nonpayment. (See Annot., 33 A.L.R.4th 579, 583 (1984).) Reviewing various authorities which discuss this issue, we find mention of elements such as the insurer's refusal to pay despite knowledge that it was liable and knowledge that refusal would result in serious damage to the insured. (See *Scheinfeld v. American Family Mutual Insurance Co.* (N.D. Ill. 1985), 624 F. Supp. 698; *Langendorf v. Travelers State Insurance Co.* (N.D. Ill. 1985), 625 F. Supp. 1103; *Barr Co. v. Safeco Insurance Co.* (N.D. Ill. 1984), 583 F. Supp. 248.) Examples of conduct found to support a finding of bad faith include: failure to adequately investigate a claim or denial of the claim without adequate supporting evidence; failure to evaluate a claim objectively; interpreting policy provisions in an unreasonable manner; unreasonably low settlement offers; reliance on misrepresentations in the insurance application which are very minor, or where the insurer's agent knowingly filled out the application falsely; and abusive or coercive practices designed to compel compromise of a claim. See Annot., 33 A.L.R. 4th 579 (1984); see also Cohen, *No Faith in Bad Faith*, 41 Hastings L.J. 201, 205-06 (1989), citing S. Ashley, Bad Faith Liability §212 (1987).

American argues that mere refusal to pay a claim does not constitute a breach of the duty of good faith and fair dealing. (*Florsheim v. Travelers Indemnity Co.* (1979), 75 Ill. App. 3d 298, 310, 393 N.E.2d 1223, 1233.) Citing *Siegal v. Health Care Service Corp.* (1980), 81 Ill. App. 3d 784, 401 N.E.2d 1037, this court in *Pekin Insurance Co. v. Home Insurance Co.* (1985), 134 Ill. App. 3d 31, 479 N.E.2d 1078, held that the refusal to pay must be accompanied by "vexatious, unreasonable, outrageous conduct," using language very similar to that contained in section 155. Indeed, "bad faith" has been held to be the semantic equivalent of "vexatious and unreasonable" conduct. (See *McCall*, 117 Ill. App. 3d at 112, 452 N.E.2d at 897; see also *Roberts v. Western-Southern Life Insurance Co.* (N.D. Ill. 1983), 568 F. Supp. 536.) We conclude that conduct such as that set forth in the preceding paragraph constitutes "vexatious, unreasonable and outrageous" conduct and supports a finding of bad faith for which compensatory damages may be recovered.

■ Count III of plaintiffs' complaint alleges, *inter alia*, that American rejected plaintiffs' claim for the full policy proceeds despite the knowledge that:

> "At the time of this rejection and settlement offer, the defendant knew the following: 1) an overseas trotting market existed and was strong, and the custom and practice was that buyers paid all exportation costs; 2) the two figures allegedly misrepresented by the plaintiffs on their application were in one instance supplied by the insurer and in the second instance were necessarily only an estimate of future breeding performance for an upcoming season, or, in the alternative, were the number of mares which were exposed to the stallion, as opposed to the number of mares which actually became impregnated; 3) that it was ignoring factors—overseas market value and the Illinois Breeder's Cup Program—which it knew would increase the actual cash value of the horse; and 4) defendant's own agents had appraised the horse at $50,000 and had accepted premiums for the amount of coverage, and now only a few months later defendant's agents were claiming that the horse appraised for as little as $10,000. The conveyance by the insurer to the insureds of this rejection letter, despite the insurance company having knowledge of this information contradicting the reasoning behind the rejection, was intended to induce and to coerce the insureds into accepting a settlement in an amount substantially less than the actual cash value ***."

We find the allegations in count III of the complaint sufficient to state a cause of action for breach of duty of good faith and fair dealing.

American next argues that the verdict on count III was against the manifest weight of the evidence. On review, a verdict will not be overturned "unless, considering all the evidence in the light most favorable to the party who prevailed at trial, the jury's conclusion is palpably erroneous and wholly unwarranted." (*Holmes v. Sahara Coal Co.* (1985), 131 Ill. App. 3d 666, 674, 475 N.E.2d 1383, 1389.) With this standard in mind, we turn to review the evidence presented at trial. One of the bases upon which plaintiffs' claim of bad faith rests is American's refusal to consider the overseas market in determining the actual cash value of Tough Cookie. American's defense of its refusal to consider the overseas market potential of Tough Cookie was the insurance policy's geographic-limitation provision. That provision provided that American "[would] not be liable for any claim on any animal that is removed from: 1) the U.S.; and/or 2) Canada." American maintained at trial, and maintains on appeal, that this provision

excludes consideration of overseas markets in assessing actual cash value because the risk was underwritten based upon the horse's presence in the United States or Canada.

Only one of American's appraisers, Curt Greene, testified at trial. Greene was the general manager of Tattersaw Sales, a sale barn in Lexington, Kentucky. Greene testified that as general manager, he was engaged primarily in public relations and administrative duties. When a horse was sold, he always hired a pedigree reader. Curiously enough, the reader he usually employed was Carl Becker, whom Greene described as "without question" the foremost pedigree reader in the nation. In rendering his appraisal of $15,000, Greene did not consider the overseas market because "[t]hat wasn't what [he] was asked to do." Greene testified that there was a strong overseas market for standardbred stallions and that he told American that Tough Cookie would probably bring a higher price overseas. Finally, Greene admitted that he did not consider the Breeders Cup Program in making his appraisal.

Carl Becker, one of the appraisers employed by plaintiffs, testified that he raises and sells standardbred stallions and has worked as a pedigree reader since 1965. He stated that he worked every standardbred sale in the nation except one. Becker indicated that his appraisal was based upon Tough Cookie's export potential and racing history. Factors important to European buyers were pedigree and racing history, both of which were strong points for Tough Cookie. Becker further testified that the European market has been a factor in the price of trotters for 25 years and that the market had been very strong for the last 10 years. Becker stated that the first thing anyone wishing to sell a trotter thinks about is the European market and that most people who knew the standardbred business turned to Europe when they had a horse to sell. Becker indicated that in January of 1986, 60% of all domestic standardbreds were sold overseas, and that such figure had held true as far back as 1976.

Plaintiffs' other appraiser, Per Henricksen, was a Norwegian who has been buying and selling trotting horses overseas since 1974. He indicated that he had been involved in 150 to 200 exportations from America. Henricksen testified that Tough Cookie would have been attractive to European buyers and could have been sold for $50,000.

■ Given the expertise of plaintiffs' appraisers, their intimate familiarity with the business, their testimony regarding the importance of the European market in determining a horse's value, and the fact that there is no mention of the geographic-limitation provision in either the rejection letter or the adjustment file, the jury could have

concluded that American well knew that the European market would have valued Tough Cookie considerably higher than the domestic market and employed a strained interpretation of a contract provision in order to exclude the European market from consideration, thereby deflating Tough Cookie's actual cash value, and that this defense was developed after the fact, in order to justify American's position.

Another basis of plaintiffs' allegation of bad faith was American's accusation that plaintiffs misrepresented Tough Cookie's breeding history on the insurance application and that this misrepresentation diminished the horse's value. The insurance application required disclosure of the number of mares "serviced" in the prior year and the current year. The application indicates the number of mares serviced as 27 and 30, respectively. The insurance adjuster, Livestock Services, sent plaintiffs a proof-of-loss form requesting, *inter alia*, a livestock-breeding report for the last two years. The breeding reports, which are prepared for the United States Trotting Association (USTA), indicated that 20 mares were bred to Tough Cookie in 1984, 80% of which produced colts, and 19 mares were bred in 1985, 12 of which were owned by plaintiffs and so generated no stud fees. At trial, Emerson indicated that the lower numbers represented mares actually "in foal and reported in foal," not the total number of mares bred. Janet Emerson testified that plaintiffs bred mares from mid-February through July, and that the breeding reports had to be turned in to the USTA and the Illinois Breeding Program by the first of September. Mrs. Emerson stated that she did not list the names of mares that had been bred but did not conceive foals. Mrs. Emerson indicated that it was her impression that the insurance application required the number of mares actually serviced by Tough Cookie.

The jury could easily have concluded that the alleged "misrepresentation" was merely a misunderstanding by the insureds as to what information American wanted, that it was of a minor nature, and that it was utilized by American as a pretext for refusing to pay the full value of the insurance contract and offering an unreasonably low settlement. Given the evidence presented, we cannot say that the jury's finding that American acted in bad faith was against the manifest weight of the evidence.

■ American next argues that plaintiffs failed to state a cause of action for intentional infliction of emotional distress, again contending that such a claim is preempted by section 155. As we have previously stated, section 155 bars all punitive-damage claims, but as with the case of bad-faith conduct, we do not interpret section 155 to preempt compensatory-damage claims for the intentional infliction of emotional

distress. American also contends that plaintiffs failed to allege facts sufficient to state a claim for intentional infliction of emotional distress. The elements necessary to state a cause of action for intentional infliction of emotional distress are: "First, the conduct involved must be truly extreme and outrageous. Second, the actor must either *intend* that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause *severe* emotional distress. Third, the conduct must in fact cause severe emotional distress." (Emphasis in original.) (*McGrath v. Fahey* (1988), 126 Ill. 2d 78, 86, 533 N.E.2d 806, 809, citing *Public Finance Corp. v. Davis* (1976), 66 Ill. 2d 85, 90, 360 N.E.2d 765, 767.) Count IV of plaintiffs' complaint alleged that defendant attempted to coerce them into accepting a settlement substantially lower than the policy amount "and that the defendant either knew, or should have known, that at least a high probability existed that this conduct would cause the plaintiffs severe emotional distress." Count IV further alleges:

> "That this conduct by the defendant caused both the plaintiffs to become extremely and severely emotionally distressed, angered, and upset and exposed them to economic hardship, causing them further consternation, and further that defendant's conduct, including the charge that the plaintiffs had misrepresented figures in the application for insurance, went beyond mere insult, indignity, annoyance, petty oppression, or triviality.
>
> The conduct of the defendant appeared to the plaintiffs to be in the form of extortion, and plaintiffs perceived that the defendant was in a position of power as compared to the plaintiffs and that the defendant had actual power to damage the plaintiffs' reputation and economic interest and was willing to act in such a way, and in fact did act in such a way, to attempt to coerce and induce the plaintiffs into accepting a settlement less than the fair amount to which the plaintiffs were entitled under the policy."

We conclude that the allegations were sufficient to state a cause of action for intentional infliction of emotional distress.

■ American also argues that the jury's verdict on count IV, the emotional distress claim, was against the manifest weight of the evidence. After reviewing the evidence contained in the record, we agree and therefore find that the jury's verdict on count IV was against the manifest weight of the evidence.

One of the considerations in determining whether conduct is "outrageous" is the degree of power or authority which a defendant has

over a plaintiff. As noted by the court in *Milton v. Illinois Bell Telephone Co.* (1981), 101 Ill. App. 3d 75, 427 N.E.2d 829:

> "As Dean Prosser pointed out, 'The extreme and outrageous nature of the conduct may arise not so much from what is done as from abuse by the defendant of some relation or position which gives him actual or apparent power to damage the plaintiff's interests. The result is something very like extortion.'" (101 Ill. App. 3d at 79, 427 N.E.2d at 832, quoting W. Prosser, Torts §56 (4th ed. 1971).)

The jury clearly could conclude from the evidence that American was in a position of power relative to plaintiffs and that it abused this position by attempting to coerce plaintiffs into accepting a settlement much less than the policy amount. Another significant consideration is whether the defendant reasonably believed that its objective was legitimate. As we have already determined above, the evidence is such that a jury could easily conclude that American knew it had no legitimate basis to refuse to pay the full amount of the policy. The record is devoid, however, of any evidence that American intended to cause severe emotional distress, or that American knew that there was a high probability that its conduct would cause severe emotional distress. Clearly plaintiffs were upset and angry, and knowledge that refusing to pay the full policy amount would upset and anger plaintiffs can doubtless be imputed to American, but this alone does not support a finding that American knew there was a high probability that its conduct would cause severe emotional distress. Obviously, something more than the insurer's knowledge that its insured will be angry and upset is required. While the evidence in this present case might sustain a finding that plaintiffs would suffer severe emotional upset, the evidence fails to support a finding that American had reason to be aware of this fact and so fails to support a finding in plaintiffs' favor as to the second element set forth in *McGrath*. Regarding the third element, while the evidence might have supported the jury's finding that American's conduct did in fact cause severe emotional distress, absent evidence of American's knowledge, the second element of the cause of action is unproven, and we must find the jury's verdict to be against the manifest weight of the evidence.

American also argues that the trial court abused its discretion in imposing penalties under section 155. Whether an insurer has engaged in vexatious and unreasonable conduct must be determined by examining the totality of the circumstances. (*Kohlmeier*, 170 Ill. App. 3d at 659, 525 N.E.2d at 105.) Having previously concluded that the evidence supported the jury's finding that American's conduct

breached the duty of good faith and fair dealing, we cannot say that the trial court's finding is an abuse of discretion.

■ American next argues that the court failed to properly instruct the jury on the issues and the burden of proof. Specifically, American argues that the evidence did not support giving many of the charges with respect to count IV, the emotional distress claim. Having already determined that the jury's finding with respect to count IV was against the manifest weight of the evidence, we need not address this argument.

■ American also contends that there was no adequate proof of damages suffered under count III. Specifically, American maintains that the trial court erred in permitting plaintiffs to testify that they purchased San Phillepe for $9,500 as a replacement for Tough Cookie, and that they lost money because of San Phillepe's lower quality and stature, because there was no evidence that the $50,000 policy proceeds would have enabled plaintiffs to purchase a horse closer to Tough Cookie's caliber. Janet Emerson testified that plaintiffs could have come closer to purchasing a horse of Tough Cookie's quality with $50,000, but when asked on cross-examination if she could have purchased a stallion with Tough Cookie's pedigree and racing history for $50,000, she stated, "probably not," and "[p]ossibly a hundred to two hundred [thousand] probably" would be needed. American argues that it is responsible only for income lost from a horse that could have been purchased with the policy proceeds, and there is no evidence of what that income would have been. Mrs. Emerson's statement on cross-examination does not support American's contention that the evidence demonstrated that Tough Cookie could not have been replaced for $50,000. This isolated statement is hardly conclusive as to Tough Cookie's value. Further evidence demonstrates that Tough Cookie would have been worth $50,000 to $55,000 on the European market. We find that the evidence provided a sufficient basis upon which damages could be computed, and the trial court did not err in allowing plaintiffs to introduce evidence regarding lost income resulting from purchasing a stallion of lower quality.

■ Finally, American argues that the trial court erred in excluding evidence of the amount of the arbitration award and in denying American's motion *in limine* to exclude evidence that the horse had a value greater than the amount awarded in arbitration. We conclude that the trial court was correct in excluding the amount of the arbitration award and in denying American's motion *in limine*. Arbitration did not occur until over two years after American's denial of the claim, and the issue at trial was whether American's conduct in deny-

ing the claim was made in bad faith. Further, a limiting instruction was given, at American's request, instructing the jury that value was not an issue and that the exhibits which addressed Tough Cookie's value were to be considered only in connection with American's conduct in adjusting plaintiffs' claim. Regarding the testimony of various appraisers as to Tough Cookie's value at the time of death, such testimony was relevant to the reasonableness of American's denial of the full amount of the policy and hence to the question of bad faith. The appraisers' testimony regarding the existence of the European market, the higher value it attached to trotters, and how often American trotters were sold there all bore directly on the issue of bad faith.

For the foregoing reasons, we affirm that part of the judgment of the circuit court of Pope County awarding plaintiffs $45,000 on count III, their claim for breach of the duty of good faith and fair dealing. We likewise affirm the court's award of $33,072.23 under section 155. That part of the judgment awarding Emerson $50,000 and Arcuino $5,000 for the intentional infliction of emotional distress is reversed.

Affirmed in part; reversed in part.

CHAPMAN and WELCH, JJ., concur.