**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**William J. BENSON, Defendant–
Appellant.**

No. 94–2214.

United States Court of Appeals,
Seventh Circuit.

Argued May 19, 1995.

Decided Oct. 6, 1995.

Barry Rand Elden, Asst. U.S. Atty., Joan Safford (argued), Office of United States Attorney, Criminal Appellate Division, Chicago, IL, for plaintiff-appellee.

Lowell H. Becraft, Jr. (argued), Huntsville, AL, for defendant-appellant.

Before CUDAHY, RIPPLE and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

■ William J. Benson was charged with two counts of the willful failure to file tax returns for 1980 and 1981, and a third charge of tax evasion for 1981. We reversed his original conviction on these charges in *United States v. Benson*, 941 F.2d 598 (7th Cir. 1991). A jury again convicted Benson after a second trial on the same counts. Benson again appeals. He challenges both the sufficiency of the evidence supporting his conviction and a number of the jury instructions chosen by the district court. We believe that the evidence was sufficient to support the jury's determination and that the jury instructions were not problematic. We therefore affirm.

**I.**

The following chronology documents William Benson's work activities over the last twenty-something years—a history integral to understanding both Benson's alleged tax evasion and his defense to the charge. Additional facts are contained in our previous opinion in Benson's case, *Benson*, 941 F.2d 598 (7th Cir.1991).

Originally employed by Bethlehem Steel Corporation, Benson developed a seizure disorder from a bout of encephalitis during the late 1960's. He soon began receiving disabil-

ity benefits from the Social Security Administration. He continued to accept these benefits until March 1983.

Beginning in the early 1970's, however, Benson returned to work. He apparently first began working as a bartender at a bowling alley and cocktail lounge. Next, he started assisting the Illinois Department of Revenue (IDOR) with its investigative work. In 1971, he joined forces with IDOR as an informant. He then eventually began to perform most, or all, of the tasks that IDOR's regular investigators performed. In 1974, he entered into a formal employment contract with IDOR. The employment relationship lasted until 1976, when IDOR fired him.

A fair amount of litigation eventually arose out of Benson's employment relationship with IDOR. During 1975 and 1976, individuals filed a number of lawsuits against IDOR agents generally alleging false arrests arising from an IDOR investigation of violations of Illinois's cigarette tax laws (the cigarette tax cases). Benson was among the IDOR defendants being sued. Benson himself soon began making allegations of corruption in a number of IDOR's affairs. Because his termination from IDOR occurred around the time he began making these allegations, Benson also filed suit against IDOR, claiming that the state agency violated his First Amendment rights in a retaliatory termination.

Representation of the state defendants (including Benson) in these cases was initially undertaken by the Illinois Attorney General. However, in June 1976, the Attorney General withdrew from representation because of Benson's allegations of corruption against his codefendants. The defense of IDOR employees was thereafter undertaken by an insurance company.

During this time period, IDOR was covered by a liability insurance policy issued by Continental Insurance Company. Continental's adjuster was Underwriters Adjusting Company. Underwriters assumed the defense of IDOR employees in the cigarette tax cases. It did not, however, immediately defend Benson, waiting instead approximately two years to begin accepting responsibility for his defense. Underwriters was apparently under the impression, created by IDOR, that Benson was not an "employee" covered by the policy, but was instead an independent contractor responsible for his own defense.

Benson thus undertook his own defense for approximately one year. Then, in September 1977, attorney Andrew Spiegel began to represent him in the cigarette tax cases. In September 1978, Benson and Spiegel contacted Underwriters with documentation of Benson's employment status, and Underwriters agreed to undertake his defense. At that point, Benson had not paid any money to Spiegel for the representation rendered. By mid-November, Underwriters had paid Spiegel for all work done beginning with his entry into the case in September 1977.

Benson and Spiegel soon contacted Underwriters about work Benson had done on his own defense. They apparently prepared two different bills reflecting Benson's work. The first covered work done from November 1976 to October 1977 (when Benson was unrepresented). The second covered work from October 1977 to January 1979. They also agreed that Benson would continue to do the investigative work on his own cases.

In late 1979 or early 1980, Benson met with Charles Rhodes, Underwriters' Chicago branch manager, and asked whether Underwriters would reimburse him for the investigative work he had done defending his own case. Rhodes agreed to the requested reimbursement and told Benson to have Spiegel verify that Benson's work was necessary to his own defense. Spiegel wrote Rhodes a letter suggesting that he had employed Benson as an investigator and that he was billing Benson's time at $15 per hour. Rhodes agreed to this fee, and Speigel's periodic bills to Underwriters began to include regular charges for Benson's investigative work.

In July 1980, Underwriters paid Spiegel the first bill, which included a fee for Benson's investigative work. Thereafter, Underwriters paid the periodic bills that Spiegel would submit, each including amounts for Benson's investigative work. In March 1981, Benson was dismissed as a defendant in the cigarette tax cases, no damages having been assessed against him. In June 1981, Spiegel

submitted two statements to Underwriters. The first was the final bill for the last two months of litigation, including Benson's investigative services for that time period. The second was the set of previously prepared billings for attorney's fees and investigative work performed from November 1976 to September 1978. Underwriters paid both amounts.

Benson apparently hand-carried Spiegel's bills to Underwriters and returned a couple of days later to pick up the checks and take them to Spiegel. He would then accompany Spiegel to the bank, where Spiegel would deposit the checks in his law firm's regular business account. Spiegel then paid Benson his share in cash, issuing no receipt.

In all, Underwriters paid Speigel $264,-856.82, including legal fees, investigative fees and other expenses. Of that amount, Benson received $9,984.80 in 1980 and $100,706.22 in 1981. Benson never filed tax returns for these years.

A jury found Benson guilty of tax evasion and of the willful failure to file income tax returns. The district court sentenced him to four years in prison followed by five years of probation. Benson presently appeals his conviction.

## II.

Benson asserts a number of complaints on appeal. His first argument concerns the sufficiency of the evidence. He contends that the amounts that he received from Underwriters under the guise of "investigator's fees" actually constituted a settlement of his claim against Underwriters for its failure to immediately undertake his defense in the cigarette tax cases. He also complains that the district court failed to give the jury instructions outlining this defense to the nonpayment of income tax, and that the district court erred in issuing several other instructions. We believe that the evidence was sufficient to support Benson's conviction, and we otherwise agree with the manner in which

the district court handled matters before the jury. We therefore affirm.

### A. The Sufficiency of the Evidence

■ Benson claims that the amounts that he received from Underwriters, ostensibly as "investigator's fees," really amounted to payment for settlement of a claim he had against Underwriters for the insurance company's breach of its duty to defend him. Because damages on account of personal injuries are nontaxable, 26 U.S.C. § 104(a)(2), Benson suggests that he never owed income tax on Underwriters' payments to him. The evidence, in his view, is therefore insufficient to support his conviction for tax evasion under 26 U.S.C. § 7201.

In making a challenge to the sufficiency of the evidence, a defendant shoulders a major burden. "Only where the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict." *United States v. Tipton*, 964 F.2d 650, 657 (7th Cir.1992) (citations omitted). We will therefore uphold the conviction unless, viewing the evidence and all inferences drawn from it in the light most favorable to the government, some required element of the crime is not reflected in the record.

■ In order to sustain a conviction under 26 U.S.C. § 7201, the government must demonstrate: (1) willfulness; (2) the existence of a tax deficiency; and (3) an affirmative act constituting an attempt to evade or defeat the payment of tax. *United States v. Tishberg*, 854 F.2d 1070, 1072 (7th Cir.1988). Here, Benson apparently contends that his taxes were not deficient because the amounts that he received were really a nontaxable settlement for damages. He also appears to suggest that the element of willfulness was lacking because of his belief that he received a settlement. We do not accept either proposition.[1]

1. Benson makes a bald assertion that the evidence is generally insufficient to support a finding on *any* of the required elements of tax evasion. He does not, however, offer further support for this allegation, either factually or legally.

We therefore consider further arguments beyond the scope of those discussed waived. *See Holzman v. Jaymar–Ruby, Inc.*, 916 F.2d 1298, 1303 (7th Cir.1990); *Varhol v. National R.R. Passenger Corp.*, 909 F.2d 1557, 1566 (7th Cir.1990).

■ We disagree with Benson's claim that no tax deficiency existed. Even if we were to assume that Benson received payments in the settlement of a claim he may have had against Underwriters, that money would not have been exempt from income tax. "The definition of gross income under the Internal Revenue Code sweeps broadly." *United States v. Burke,* 504 U.S. 229, 233, 112 S.Ct. 1867, 1870, 119 L.Ed.2d 34 (1992). 26 U.S.C. § 61(a) defines gross income as "all income from whatever source derived...." This section generally places a taxpayer wishing to avoid tax in the position of demonstrating that his gain falls within a recognized exception to the rule articulated in § 61(a). Absent exclusion under a recognized rule, however, the sum is taxable. *Comm'r of Internal Revenue v. Schleier,* — U.S. —, —, 115 S.Ct. 2159, 2163, 132 L.Ed.2d 294 (1995); *Downey v. Comm'r of Internal Revenue,* 33 F.3d 836, 837 (7th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 2576, 132 L.Ed.2d 827 (1995). It is thus clear that the sums Underwriters paid to Benson are generally taxable—even if characterized as the settlement of a claim—unless Benson can show that they fall within a recognized exception.

■ 26 U.S.C. § 104, upon which Benson attempts to rely, contains such an exception. Section 104 excludes from taxation compensation received for injuries or sickness, and it provides that:

(a) ... gross income does not include—
(2) the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness;

26 U.S.C. § 104(a)(2). Courts have interpreted Section 104 to give rise to a two prong test for excludability. First, based on the treasury regulations drafted to enforce the section, a litigant must show that damages received were received "through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution." 26 C.F.R. § 1.104–1(c). The Supreme Court interpreted this section in *Burke* narrowly, disallowing the exclusion of back-pay awards under Title VII. 504 U.S.

at 241–42, 112 S.Ct. at 1874. Second, the damages received must have been received "on account of personal injuries." *Schleier,* — U.S. at — - —, 115 S.Ct. at 2164–66.

Following *Burke,* with reference to the first prong of the test, we have stated that the touchstone in determining whether a given action was "tort or tort type" is:

the availability of a broad range of damages to compensate the plaintiff for injuries caused by the violation of a legal right, and while such damages are often described in compensatory terms, tort damages usually "redress *intangible* elements of injury."

*Downey,* 33 F.3d at 839 (citations omitted). Guided by this principle, we held that an award for back-pay and liquidated damages could not be excluded from taxation under § 104(a)(2). *Id.* at 840. *See also Schleier,* — U.S. at —, 115 S.Ct. at 2167 (distinguishing factor of tort type right is the availability of compensatory remedies often redressing intangible, nonpecuniary elements of injury).

■ Here, the clear premium that *Burke* places upon the tort-like nature of the claim for damages undercuts Benson's attempt to demonstrate that his claimed settlement is not taxable. Even assuming that Benson's gain was a sum paid in settlement for the breach of a duty to defend, Benson's underlying claim would be neither tort nor tort-like. Instead, the breach of a duty to defend provides, in general, an action in contract. *See, e.g., Reis v. Aetna Casualty & Surety Co.,* 69 Ill.App.3d 777, 25 Ill.Dec. 824, 833, 387 N.E.2d 700, 709 (1978) (a refusal to defend breaches contract and equitably estops insurer from later using contract provision to its benefit to claim that coverage does not exist); *Playboy Enters. v. St. Paul Fire & Marine Ins.,* 769 F.2d 425, 427 (7th Cir.1985). "When an insurer declines to provide a defense for the insured, the insured may subsequently sue the insurer. An incorrect decision by the insurer is, of course, a breach of the insurance agreement." Robert E. Keeton & Alan I. Widiss, Insurance Law § 9.1 (West 1988). In light of this, again as a general rule, "damages in this type of case are usually limited to the policy limits."

*Green v. J.C. Penney Auto Ins. Co., Inc.*, 806 F.2d 759, 762 (7th Cir.1986). Because, as a first cut, *Burke* contemplates tax exclusions only for "civil wrong[s], other than breach[es] of contract," 504 U.S. at 234, 112 S.Ct. at 1870, Benson cannot avail himself of § 104's exclusion here.

Our conclusion on this issue is not altered by the fact that sometimes, the breach of a duty to defend can have tort-like qualities. Some commentators have suggested that a court's use of the terms negligence or bad faith to describe an insurer's conduct in refusing to defend marks a departure from strict contract to tort. *Failure to Defend Insured*, 20 A.L.R.4th 23, 26. And Illinois apparently recognizes the addition of a negligent or bad faith element to a breach of a duty to defend claim. *See J.C. Penney*, 806 F.2d at 763; *Conway v. Country Casualty Ins. Co.*, 92 Ill.2d 388, 65 Ill.Dec. 934, 936–37, 442 N.E.2d 245, 247–48 (1982). But none of this means that an action for the breach of a duty to defend has lost its contractual character for the purposes of the tax laws. As we have mentioned, the touchstone of the inquiry is whether a cause of action provides compensation "for those intangible elements of injury essential to a personal injury tort action." *Downey*, 33 F.3d at 839. Benson has not directed our attention to any elements of damage that might render his claim tort-like, and we cannot locate any.[2]

To the contrary, Benson only received sums related to the actual costs of his defense—namely, attorney's and investigator's fees. Spiegel's itemized bills, which included costs for investigator's fees, charted the amounts that Underwriters ultimately paid Spiegel and Benson. This was the case even with regard to the final, retroactive payment for the original periods that Benson defended himself. Benson's case (assuming, again, that he had one) thus presented only a question of reimbursement for the actual costs of his defense—attorney's fees, investigator's fees and related expenses.

In addition, these were apparently the only damages that Benson could have received for the settlement of any claim he may have had. Benson was ultimately dismissed as a defendant, and no judgment was ever rendered against him. No questions involving an insured's attempt to recover an adverse judgment from an insurer therefore arose. *See, e.g., J.C. Penney*, 806 F.2d at 762–64. Nor did Benson's case present a problem of an insurer's bad faith or negligence, with the insured's consequent demand that the insurer be liable for a judgment in excess of the policy limits. In short, because there was no underlying judgment against Benson in the cigarette tax cases, the only possible damages arising from the alleged breach (on the facts of which Benson has made us aware) were the costs of Benson's defense. *See Reis*, 25 Ill.Dec. at 835, 387 N.E.2d at 711. These amounts may have been recoverable in a suit against Underwriters, but they would only have been damages flowing from a straightforward breach of contract—*not* excludable under § 104(a)(2) as damages for personal injuries.

■ Benson certainly has not come forward with any authority to the contrary. He points to a number of cases permitting an insured to recover beyond the policy limits because of the presence of bad faith.[3] *See, e.g., Emerson v. American Bankers Ins. Co.*, 223 Ill.App.3d 929, 166 Ill.Dec. 293, 298–99,

2. We note in this regard that, in his briefing, Benson does not allege that Underwriters played any part in the activities that formed the basis for his First Amendment claim against the State (he does not, for instance, claim that the failure to defend him was retaliatory). Instead, he relies on the simple fact that Underwriters did not undertake his defense at the point in time that the Attorney General abandoned it.

3. Benson also suggests that because he was not the insured, but was a beneficiary under the policy, the refusal to defend sounded in tort and not contract. Benson has provided absolutely no support for this proposition, which we find legal-

ly questionable in any event. Depending upon the language of the insurance contract, the duty to defend can extend to others in addition to the contracting party. *See, e.g., Consolidated Rail Corp. v. Liberty Mutual Ins. Co.*, 92 Ill.App.3d 1066, 48 Ill.Dec. 485, 487–88, 416 N.E.2d 758, 760–61 (1981) (holding that parent of subsidiary which had contracted with the insurer was also an insured to whom the duty to defend extended). In any event, Benson has not come forward with any authority for this proposition. We therefore consider the matter waived. *Holzman*, 916 F.2d at 1303; *Varhol*, 909 F.2d at 1566.

585 N.E.2d 1315, 1320–21 (1992) (providing laundry list of bad faith actions). Yet none of these cases tell us why damages for the breach of a duty to defend ought to be exempt from taxation under § 104(a)(2). And further, they fail to demonstrate the presence of bad faith in Benson's case, which, as we have stated, presented no question of the need to recover beyond the policy limits. The record otherwise appears to us to be devoid of bad faith or negligence on the part of Underwriters. This, in any event, was the finding of the district court, which noted that the insurance company had relied upon the State's assurance that Benson was not an employee. Although Benson makes a bare allegation of bad faith, he points to neither specific facts nor caselaw to support it. Instead, he appears to be relying simply upon the fact of Underwriters' failure to undertake his defense. Under these circumstances, we believe that any tort-like attributes that a claim for the breach of a duty to defend *may* sometimes possess were not present in this case. Because Benson's claim, assuming that he had one, would have been contractual in nature, any sums that he received in settlement of that claim were not exempt from tax pursuant to § 104(a)(2).[4]

Benson's case is, in any event, otherwise infirm. Benson never filed a claim against Underwriters complaining of the company's conduct. Nor, for that matter, did he sign a statement releasing the company from liability for the alleged breach (a matter which we assume an insurance company would have insisted upon in effecting a settlement). Underwriters' representatives in fact contend that a possible claim arising from the alleged breach of a duty to defend was never discussed. Nor, according to Underwriters, was a settlement ever agreed upon. For the purposes of tax liability at least this fact is dispositive; a taxpayer's after-the-fact characterization of a settlement will not be respected in light of a contrary intent on the part of the payor. *Knuckles v. Comm'r of Internal Revenue*, 349 F.2d 610, 613 (10th Cir.1965) ("The most important fact ... in the absence of an express personal injury settlement agreement, is the intent of the payor as to the purpose in making the payment."). In addition, in light of the standard that binds us when we assess a jury's verdict, *see Tipton*, 964 F.2d at 657, we may be faced with the jury's determination that Underwriters, and not Benson, advanced a more credible story concerning the presence or absence of a settlement.

These factors, without more, would ordinarily convince us that Benson's conviction should be affirmed. Underwriters apparently did not intend to admit any liability or settle any claim, much less one for personal injuries. *See Knuckles*, 349 F.2d at 613. And the jury apparently rejected Benson's factual allegations that circumstances were something other than Underwriters claimed. Benson argues, however, that *he* believed that the sums that he received were in settlement of a claim, and that this fact, in light of the ambiguous nature of the payment, negates the willful nature of his violation. *See, e.g., United States v. Harris*, 942 F.2d 1125, 1131 (7th Cir.1991) (discussing the statutory necessity of a willful violation). We have previously stated that, in the realm of criminal tax liability, prosecutions must rest on a "clear rule of law." *Harris*, 942 F.2d at 1131. So we believe that some further discussion about the clarity of the rules governing Benson's gain is necessary.

In *Harris*, we found that the tax treatment of payments to mistresses was so uncertain that it provided a questionable basis for criminal liability. Because whether gain was a gift or a payment for services rendered was determined by the donor's intent, the taxpayer had little control over or knowledge of the tax status of a particular payment. 942 F.2d at 1134. Furthermore, courts had issued different rulings on the tax treatment of sums paid to mistresses. These factors combined to create a situation that failed to

---

4. In engaging in this analysis concerning tort or tort-type rights, we do not intend to overlook the additional requirement that a taxpayer demonstrate that amounts were received "on account of personal injuries or sickness." *See Schleier*, —— U.S. at ——, 115 S.Ct. at 2167. We simply base our holding on the first prong of the inquiry—a necessary but not sufficient condition for excludability. *See id.*

provide a diligent taxpayer a clear standard of conduct. *Id.*

The present case, of course, is different. Benson's relationship with Underwriters was in no sense ambiguous; as his counsel admitted at oral argument, both parties understood that Benson was working as an investigator on his own case. In addition, it is relatively clear that only settlements for damages arising from personal injuries are exempt from tax. If we assume, as we must, that Benson was aware of this rule, it is not difficult to place the burden of clarification on him. Benson might suggest that the status of the sum he received from Underwriters was unclear. But this is a matter over which he had a measure of control. He could have requested documentation from Underwriters demonstrating first that the sums he received were in settlement of a claim, and second, that the claim was for damages arising from personal injury. It was, in short, within Benson's power to remove all ambiguity from the situation. He thus could have avoided criminal liability altogether.

The lack of clarity in Benson's case is therefore quite different from the lack of clarity in *Harris.* There, payments to mistresses had been treated differently by different courts. 942 F.2d at 1133; in some cases they had been held taxable, and in some cases they had not. *Id.* It was therefore possible that the taxpayer believed she might receive the sum of money in question without income tax concerns. This factor was complicated by the informal nature of an affectionate relationship, which created a difficulty in characterizing sums as gifts or payments for services. In short, these circumstances did not provide fair notice of a possible criminal liability with the consequent demand that the taxpayer protect herself.

■ Here, in contrast, the rules governing settlements were clear. Some sort of formal documentation was necessary to successfully benefit from § 104's personal injury exclusion. *Knuckles,* 349 F.2d at 613. Although

the nature of the payments themselves may have been uncertain, Benson was aware of that uncertainty, and he could have sought clarification at an earlier date (instead of later attempting to create or benefit from ambiguity in court). Because it was within Benson's power, in the context of his business relationship with Underwriters, to eliminate the ambiguous nature of what he claims was a settlement, we do not believe that *Harris* stands in the way of upholding his conviction. He cannot escape the jury's finding of willfulness by pointing to the ambiguous nature of the payments from Underwriters.[5]

We believe, in short, that the evidence was sufficient to support Benson's conviction. Even assuming that he had settled a claim with Underwriters, the sums that he received would have been damages flowing from the breach of a contract, not damages arising from personal injuries under § 104(a)(2). In addition, we have strong reservations about allowing Benson to maintain that he believed that a settlement existed here. Such a claim is supported by neither the jury's verdict nor Underwriters' intent in paying the sums of money. Benson's conviction, as to the sufficiency of the evidence, is therefore affirmed.

### B. *The Jury Instructions*

■ We also believe that Benson's complaints about various jury instructions lack merit. He essentially asserts three errors. He suggests first that the district court erred in refusing to tender several instructions outlining his theory of defense to the jury. He next suggests that the district court erred in defining willfulness to the jury. Finally, he claims that the district court erred in refusing a requested instruction concerning reliance on the advice of a government official. Benson apparently failed to preserve error on these objections, however. Although he submitted his requested instructions, this alone is not sufficient to preserve error for appeal. *United*

---

5. In addition, at oral argument, members of the panel inquired of the government whether payments to Benson as an investigator might have been gratuitous since he may not have been entitled to payment for services rendered in his own defense. This argument, however, has not been advanced or adopted by Benson (he in fact insisted that he was entitled to payment for the services). The argument is therefore waived.

**649**

*States v. Mounts,* 35 F.3d 1208, 1221 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1366, 131 L.Ed.2d 222 (1995). Instead, a defendant must object on the record to the district court's refusal to tender the requested instructions, clearly stating the reason for the objection. *Id.* Because Benson failed to object to the instructions that the court decided were appropriate, we must evaluate his claims under the "plain error" standard. *See id.* Plain error is an error so egregious that it results in a miscarriage of justice. *Id.*

 The present record fails to reveal a miscarriage of justice. To the contrary, we believe that the district court properly refused to submit Benson's proffered instructions to the jury. A number of instructions related to Benson's theory of defense. These instructions would have generally informed the jury of various rules about the taxation of damages, suggesting in essence that the amounts that Benson received from Underwriters were not taxable because they constituted the settlement of a claim for the failure to defend. For reasons that we have stated above, this position is legally untenable. Under the plain error standard or otherwise, the district court therefore correctly refused to submit these instructions to the jury. To the extent that the proffered instructions implied that the sums Benson received may have been exempt from taxation, they misstated the law. It is well-established that a defendant is entitled to an instruction on a theory of defense only if, among other things, an instruction accurately states the law and is supported by the evidence. *See United States v. Edwards,* 36 F.3d 639, 645 (7th Cir.1994) (listing four criteria for reversal on the grounds of erroneous jury instructions). Because neither condition was fulfilled here, the district court properly refused to submit Benson's theory of defense instructions.

 The district court also properly rejected an instruction concerning reliance upon the statements of government officials. Benson requested that the court tender an instruction which read: "An American citizen such as Defendant has a right to rely upon representations and statements made to him by government officials." Benson apparently intended to use this instruction in order to escape liability for the illegal receipt of social security disability benefits. He claimed that someone—either a state official at the IDOR or one of two social security agents—had assured him that he might be employed for a two-year trial period and nevertheless receive social security benefits. At trial, however, Benson himself was unclear about precisely who had made this representation to him. In light of this uncertainty, it was not plain error for the district court to refuse the instruction. Some authority holds that the defense is only available if the official upon whom the defendant claims to have relied was authorized to give the advice. *See United States v. Browning,* 630 F.2d 694, 702 (10th Cir.) (agent must have authority to bind government in transaction), *cert. denied,* 451 U.S. 988, 101 S.Ct. 2324, 68 L.Ed.2d 846 (1981). This principle justifies the district court's refusal to give the instruction.

 Finally, the district court did not plainly err in its failure to advise the jury that a good faith belief concerning the requirements of the tax laws may be subjective and need not be objectively reasonable. Although this is generally a correct statement of the law, *see Cheek v. United States,* 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991), a precise definition of good faith highlighting subjectivity is not necessary to a willfulness instruction. *United States v. Hauert,* 40 F.3d 197 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1822, 131 L.Ed.2d 744 (1995). Further, the reasonableness of a belief is a factor which bears upon whether the belief was in fact held in good faith. *United States v. Hilgeford,* 7 F.3d 1340, 1343 (7th Cir.1993). Under these circumstances, it was not plain error for the district court to refuse to further define a good faith belief.

### III.

The evidence was sufficient to support Benson's conviction. He cannot escape criminal sanction simply by characterizing the sums he received from Underwriters as a settlement of a claim because any claim that he possessed would have been contractual in nature, and any damages that he might have

recovered in the prosecution of this claim would have been related to the simple costs of his defense. Under these circumstances, Benson's gain would not be excludable as damages received on account of personal injuries. We question the existence of a settlement and Benson's claimed reasonable belief in the same in any event. In light of the conflicting evidence on the issue, the jury certainly was not under any obligation to accept Benson's version of the facts. Finally, we believe that the jury instructions sufficiently apprised the jury of its deliberative tasks.

For these reasons, the judgment of the district court is AFFIRMED.